## IN THE UNITED STATES DISTRICT COURT
## FOR WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **DR. ROBERT W. MALONE** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Case Number: 3:22-cv-63** |
| | ) | |
| **PETER R. BREGGIN, MD.** | ) | |
| **GINGER ROSS BREGGIN,** | ) | |
| **AMERICA OUT LOUD,** | ) | |
| **DR. JANE RUBY** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **RED VOICE MEDIA** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### DEFENDANTS DR. PETER R. BREGGIN AND GINGER R. BREGGIN'S BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

COME NOW, Dr. Peter R. Breggin (hereinafter "Dr. Breggin") and his wife Ginger R. Breggin (hereinafter "Mrs. Breggin") (collectively, "the Breggins"), by counsel, and for their Brief in support of their Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, state as follows:

### Background

Both the Plaintiff and the Breggin Defendants are public figures engaged in their profession in the field of medicine, and are currently a part of the public discussion regarding the science and politics of both the coronavirus pandemic and COVID-19 vaccine. Plaintiff Robert Malone filed his lawsuit against the Breggins, alleging that he is entitled to over twenty-five million dollars ($25,000,000.00) in damages because he asserts that the Breggins "began to publish

1

false statements, defamatory implications and insulting words about Dr. Malone in internet articles, podcast videos and via social media (Telegram and Twitter)." (Pl. Compl. ¶ 1). Dr. Malone is a licensed medical doctor living in Madison County, Virginia. He asserts that he "is a world-renowned scientist and expert in the field of mRNA technology. He was the leading contributor to the science exploited by Pfizer and other pharmaceutical corporations to create the alleged 'vaccines' for the novel coronavirus ("COVID-19")." (Pl. Compl. ¶ 1). He claims to be the "original inventor of mRNA vaccination as a technology, DNA vaccination and multiple non-viral DNA and RNA/mRNA platform delivery technologies." (Pl. Complaint, ¶ 3).

The Defendants Peter R. Breggin MD who is 87 years old, and his wife Ginger Breggin are citizens and residents of New York. Dr. Breggin is a lifelong reformer in the field of medicine, and is known as "The Conscience of Psychiatry" for his criticism of biological psychiatry and his promotion of more effective, empathic, and ethical forms of psychological, educational, and social approaches to people with emotional suffering and disability.

In a 2022 book, *The Courage to Face COVID-19,* by journalist John Leake and physician Peter A. McCullough MD, MPH, Dr. Breggin's scientific work is not only cited but an entire chapter, "*The Conscience of Psychiatry*," is devoted to his lifetime reform work leading up to his contributions in the field of COVID-19. Leake and McCullough write:

> In dangerous times, when wisdom is needed the most, exceptionally wise individuals may no longer be at hand to make sense of what is going on and to enlighten the rest of us. Not so with Peter R. Breggin, MD. When COVID arrived, the practicing psychiatrist and author was just shy of 84, but his capacity for observation and research—which he'd steadily honed during fifty years of closely watching the medical and pharmaceutical industry—had not diminished at all. (p. 216)[1]

---

[1] John Leake and Peter McCullough (2023). *The Courage to Face COVID-19.* Dallas, TX: Counterplay books.

He graduated from Harvard College with Honors and his psychiatric training included a Teaching Fellowship at Harvard Medical School. Following his training, he became a full time Consultant in the U.S. Public Health Service at NIH, assigned to the National Institute of Mental Health, while simultaneously serving as Lt. Commander in the US Public Health Services. Since then, he has taught at several universities, including Johns Hopkins, George Mason, and the University of Maryland, as well as at the Washington School of Psychiatry.  Dr. Breggin is the author of more than 20 medical and scientific texts, as well as popular books, including the bestseller and highly-documented *Talking Back to Prozac,* co-authored by his wife Ginger. Since 2020, Dr. Breggin has been qualified as a medical and psychiatric expert more than 100 times in the U.S. and Canada, including several landmark cases in favor of patient rights since 1973.  In [*Kaimowitz v. Department of Mental Health]* Dr. Breggin expert testimony stopped psychosurgery and lobotomy in all of America's state hospitals, in the VA, and NIH.[2]

Dr. and Mrs. Breggin have been involved in the public discussion regarding a complete examination of the real science surrounding COVID-19 and the efficacy of the resulting vaccine and its effect on humanity throughout the world.  They have published numerous articles on the subject, and have participated on panel discussions, media interviews and appeared on podcasts and other social media platforms to discuss their views. In November 2021, they wrote and published *COVID-19 and the Global Predators*, a bestseller with over 120,000 copies sold worldwide.

In his Complaint, Dr. Malone alleges that the Breggins defamed him by false statements made about him in the public discussion over the coronavirus vaccine (Count I), defamed him by

---

[2] Peter R. Breggin. (1975).  "Psychosurgery for Political Purposes." *Duquesne Law Review*, 13:841-862, 1975. https://z0sqrs-.akamaihd.net/6905_breggin/uploads/2008/01/psychosurguryforpolitical.pbreggin.1975.pdf;  Also see, Dr. Breggin's website. Undated. THREE-JUDGE OPINION ULTIMATELY ENDS PSYCHOSURGERY IN STATE HOSPITALS, VA AND NIH: DR. BREGGIN'S TESTIMONY SETS STAGE TO INVOKE NUREMBERG CODE: ://breggin.com/article-detail/post_detail/the-landmark-kaimowitz-trial-against-psychosurger https y

implication because the allegedly defamatory statements made in internet articles, podcast videos

and on social media platforms (referred cumulatively to by Plaintiff as "the Statements" in his

Complaint) were delivered by the Breggins with the "strong gist and implication… that Dr.

Malone is intentionally dishonest, deceitful, immoral, unethical and dangerous, and that he is unfit

to practice medicine." (Pl. Complaint, ¶ 23) (Count I).[3]  Dr. Malone also alleges that the Breggins

used "insulting words, in the context and under the circumstances in which they were spoken and

written" with the intent to incite violence and a breach of the peace. (Pl. Comp. ¶ 28-30) (Count

III).

## Preliminary Statement

In *Webb v. Virginian-Pilot Media Cos.*, 287 Va.84 (2014), the Virginia Supreme Court

recognized the chilling effect of defamation claims on Free Speech in the public square, and

clearly stated that a trial court had an "essential gatekeeping function" to ensure that "defamation

suits proceed only upon statements which may actually defame a plaintiff, rather than those which

merely may inflame a jury to an award of damages." *Id.* at 90.  The court further strengthened this

position when it held that the trial court shall decide, as a preliminary matter, and "as a threshold

matter of law whether a statement is reasonably capable of defamatory meaning before allowing

the matter to be presented to a finder of fact." *Schaecher v. Bouffault*, 290 Va. 83, 94 (2015).  The

Fourth Circuit has ruled consistently with the aforementioned holding in *Webb* by the Virginia

Supreme Court. In *Virginia Citizens Defense League v. Couric*, the Fourth Circuit reviewed a

lower courts dismissal of defamation claims in a case involving the VCDL and journalist Katie

Couric, wherein the VCDL had sued Couric over her documentary film that made it appear as

though, through film editing, gun rights activists that were interviewed could not (or would not)

---

[3] There are two "Count I 's" in Dr. Malone's Complaint.

answer questions regarding gun policy in the nation.  In affirming the lower court's dismissal of

the Complaint on Rule 12(b)(6) motion by the Defendant, the court found:

> In a last-ditch effort to rescue the complaint, appellants cite news reports covering the controversy to suggest that "viewers of Under the Gun actually understood the exchange" as negatively portraying the VCDL and its members. Assuming this is true, it does not answer the question before us.  Regardless of how certain media outlets covered the short-lived media frenzy surrounding this incident, the Supreme Court of Virginia has consistently stressed that it is the province of the court to perform the "gatekeeping" role of distinguishing defamatory speech from mere insults.
> *Schaecher,* 772 S.E.2d at 595; *Webb,* 752 S.E.2d at 81 I.
>
> Courts should not - indeed, cannot -- abdicate this role in hopes that a member of the press or public will answer the question for them.  Instead, Virginia law requires courts to exercise independent legal judgment as to whether challenged statements are susceptible to the defamatory meaning alleged.  *See, e.g., Perk,* 485 S.E.2d at 144 (concluding that challenged statements were not "sufficiently defamatory on their face to permit a fact finder to decide whether in fact the statements were actually defamatory").
>
> If any doubt remained on this point, the Supreme Court of Virginia's recent decision in *Webb v. Virginian-Pilot* closes the door.  There, the court considered an appeal from a jury verdict that rested on testimony from several witnesses suggesting that they inferred defamatory meaning from the challenged news article.  *Webb,* 752 S.E.2d at 812.  Notwithstanding this evidence, the court reversed, holding as a matter of law that the article was not reasonably capable of the defamatory meaning ascribed.  *Id.*  Applying these principles, we conclude that the district court properly performed its independent gatekeeping role in this case. And on the merits of that question, the district court reached the correct result.

*Va. Citizens Def. League v. Couric,* 910 F.3d 780, 786-87 (4th Cir. 2018).

The Fourth Circuit has held that the First Amendment "reaches its apogee," where

the challenged speech involves matters of public concern: "although Virginia's

common law of libel governs this diversity case, the First Amendment's free press and

speech clauses greatly restrict the common law where the parties are public figures, or

the subject matter of the supposed libel touches on a matter of public concern.  Where,

as here, all of these considerations are present, the constitutional protection of the press reaches its apogee." *Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087, 1091-92 (4th Cir. 1993) (citation omitted).

All of the aforementioned factors have converged in this case. The Plaintiff is a public figure in the field of COVID-19 vaccinations immunology who is complaining about the strong counter opinions expressed by a fellow member medical community who is also a public figure in the field of COVID-19 vaccination immunology, in the forum of the nationwide debate in the media over the efficacy of the coronavirus vaccine. The statements about which the Plaintiff complains, while admittedly direct, consist of nothing more than (1) opinions about the Plaintiff's ever-changing position of the vaccine, (2) imagined defamatory implications that are not actionable as a matter of law, and/or (3) are statements that are plainly true or substantially true. Moreover, Malone has not and cannot allege actual malice. Even without "the broadest protection the First Amendment can afford," *see Jackson v Hartig*, 274 Va. 219, at 231 (2007), the Plaintiff's claims fail because he has not alleged any actionable statements sufficient to support a claim for defamation against Dr. and Mrs. Breggin.

## I. Standard for a Motion to Dismiss

A motion to dismiss "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662,678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis,* 588 F.3d at 193. Rather, a

plaintiff must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the plausibility of entitlement to relief." *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). "[A] plaintiffs obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The allegations must "raise a right to relief above the speculative level.)" *Id.* Pleading only the "possibility" of a violation is not enough; a complaint must present the "plausibility of 'entitle[ment] to relief'" *Id.* at 557. While a court presumes all "factual allegations in the complaint to be true and accords all reasonable inferences to the non- moving party," the Court is not bound to accept as true "conclusory allegations regarding the legal effect of the facts alleged." *Westmoreland v. Brown*, 883 F. Supp. 67, 70 (E.D. Va. 1995) (quoting *Labram v. Havel*, 43 F.3d 918,921 (4th Cir. 1995). Indeed, the "presence... of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of [liability]." *Young v. City of Mount Ranier*, 238 F.3d 567,577 (4th Cir. 2001).

In deciding a Rule 12(b)(6) motion, the court may consider not only the facts stated in the complaint, but also any incorporated documents and any documents integral to the complaint and relied upon by a plaintiff in bringing the action. *See Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999). Similarly, when a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss, and the Court may consider the same without converting the motion to one for summary judgment. *Gasner v. Cty of Dinwiddie,* 162 F.R.D. 280,282 (E.D. Va. 1995); *Tessler v. NBC Universal, Inc.,* Civ. A. No. 2:08cv234, 2009 WL 866834, at *3-4 (E.D. Va. Mar. 31, 2009) (Jackson, J.), *aff'd Tessler v. NBC, Inc.,* 364 F. App'x 5 (4th Cir. 2010).

## II.        The Fourteen Allegations of Defamation

In his three-count Complaint, Malone alleges fourteen instances of alleged defamation in paragraph ten (10) of the "Statement of Material Facts" of his Complaint, and provides hyperlinks that directs the reader to the "publication" and words that are allegedly "actionable."[4]  Malone identifies himself as an extremely active public figure who himself claims to have traveled 400 thousand miles in 2022 to give speeches and other public presentations around the world. Malone has grown his audience to over one million followers on his twitter accounts, tens of thousands of paid Substack subscribers and has appeared on major news shows on traditional and social media platforms.  It is without question that Malone is therefore a "public figure," which would require that Malone demonstrate that each one of these allegedly defamatory statements were made by the Breggins, with actual malice.  However, a full examination of the alleged defamatory statements demonstrates that for various reasons explained more fully below, these statements are not defamatory at all.

### A.        Five of the Allegedly Defamatory Statements were not even spoken by the Breggins

The first two items found in paragraph 10 of Malone's Complaint are words that have never been spoken by the Breggins, but rather were statements attributable to Dr. Jane Ruby.[5] And items 4 and 8 are likewise the statements of Dr. Jane Ruby and <u>not</u> the Breggins.[6]  In fact,

---

[4] For efficiency, the Breggins "number" these 14 alleged defamatory statements in the order that they are presented in Malone's Complaint.

[5] "Malone IS Dangerous. I knew from day one, this man is in the middle of every horrific thing that has happened to humanity. He is an operative running interference to keep this thing going. This is well worth your time to WATCH THE ENTIRE INTERVIEW of Dr. Peter Breggin." https://t.me/PeterBreggin/86; and "Beware of Malone pushing this previously obscure and out of nowhere, Belgian psychoanalyst, Mattias Desmet. The two of them pushing this fraudulent 'mass formation psychosis'. It's really designed to criminalize the general public and perpetuate Ernest people in the health freedom movement as conspiracy theorists." https://t.me/DrJaneRuby/7164

[6] "Breggin makes some key points: Malone was never part of any freedom or liberty movement prior to the covid scam. In fact he's the opposite. He's admitted to voting for Obama and Hillary. And his connections and associations are 100% CIA/DOD/intelligence community. That's NOT the origins of the Health freedom

Item 8 is nothing more than a title that Dr. Ruby created to a video interview that she had posted, without any assistance of, or input from the Breggins.

And while item 3 is also a quote published by Dr. Ruby, it is the summary of a podcast episode with Dr. Breggin.[7]  And, all facts contained in the summary for that podcast episode are substantiated by Malone himself in interviews, writings and even in his resume. (See Exhibit 1).

### B.  All Other Defamation Allegations Asserted By Plaintiff are Expressions of Opinion, and are not Actionable

While Item 5 is in fact a quote by Dr. Breggin, it is clearly an academic opinion and public policy analysis of the ideology of Dr. Malone and others regarding the medical and scientific concept of "mass psychosis," and is not defamatory.[8]  This topic has garnered significant debate in the public square since the arrival of the COVID-19 virus around the world, which has led to the evolution of many different opinions across the scientific community that are still debated to this day.

In item 6, Malone quotes Dr. Breggin: "Whether Desmet or Malone Consciously

---

movement. And now he's positioning himself as the 'leader of the health freedom movement' And posing as some sort of conservative freedom movement guru? NOT". https://t.me/DrJaneRuby/7166; and "Dr. Malone is orchestrating a "psyop against the people.'" https://rumble.com/v1j48gd-dr.-jane-ruby-show-mass-formation- psychosis-is-a-psyop-against-the-people

[7] "Robert Malone, campaigning around the world as a member of the health freedom movement, may be profoundly immersed in the Deep State of HHS, CDC, FDA, and Department of Defense. In the last five years, a period for which we have information, ending in 2017, Malone obtained and managed $9.5 billion in government contracts. Now he is a member of the new NIH agency ACTIV which promotes the Great Reset by bringing together multiple powerful US agencies — from the NIH, FDA, CDC, and DoD with the Bill & Melinda Gates Foundation, and ultimately with a dozen of the top pharmaceutical companies, including Gilead, GlaxoSmithKline, Johnson & Johnson, Merck & Co., Inc., Moderna, Novartis, Novavax, Pfizer." https://t.me/DrJaneRuby/7165

[8] "The synonymous concepts of mass formation, mass hypnosis, and mass psychosis have an obvious damaging impact on the international health freedom movement and on the cause of liberty everywhere. These concepts take our eyes off the totalitarian global predators who are taking over and exploiting humanity. They restrain us from charging these predators with criminal conspiracy if we win the battle with them. The pernicious effects of the Desmet/Malone ideology came fully into light with the recent publication of Desmet's The Psychology of Totalitarianism and Malone's continuing efforts in support of mass psychosis." https://breggin.com/Threats-from-the-Desmet-Malone-Mass-Formations and-Mass-Psychosis

intended it, their ideology has seriously harmful effects similar to a psyops – a psychological operation – aimed at paralyzing the health freedom movement and freedom movements worldwide" is clearly and unmistakably an opinion on the "effects" of the Malone/Desmet scientific "concepts," rather than any of their "intended" efforts, and therefore is not actionable defamation.

Item 7 of Malone's allegations of defamatory remarks by the Breggins comes from Dr. Breggin's website post, "Mass Formation and Mass Psychosis – A False and Dangerous Concept That Threatens Our Freedom."   In the posting, Dr. Breggin opines that the "Desmet/Malone concepts are a dangerous smokescreen that blinds us to the real threat against all of us – organized totalitarian globalists," where he provides a contrarian viewpoint to the ideas presented by Malone regarding the theory of "Mass Psychosis, and Mass Formations."   Again, the Breggins stated opinion is focused on the words and ideas of Malone, not Malone himself, and are therefore not defamatory in nature.

Item 9 attributes to the Breggins the quote: "Dr. Malone is the 'chief supporter' of Mattias Desmet, 'a leading apologist for political mass murderers.'"   Malone derives this quote from an "America Out Loud" article written by the Breggins in September of 2022 (entitled "Psychotherapist Mattias Desmet Failed to Report His Own Mass Murderer Patient").   Clearly, and when taken in context with the whole article, the Breggins are expressing opinions in this article, based upon their observations of the interaction between Malone and Desmet, and their description of Mattias Desmet is based upon facts from another article detailing Dr. Desmet's mishandling of a patient of his who had committed mass murder. The second part of this quote does not affect Malone in the least, ( as it is a description of Desmet), and the first part is both opinion and is supported by the previous public statements by Malone regarding Desmet.

Item 10 again cites the <u>opinions</u> of the Breggins when they said that "Desmet and Malone's [mass formation psychosis] concept deflect, discourage and undermine attempts to place the blame directly on global predators who have been committing mass murder under the guise of COVID-19." Yet Malone omits the key opening words of the quote in his Complaint, "In its effects," which clearly demonstrates that this opinion was an attack on the scientific <u>concepts</u> put forward by persons, and was <u>not</u> an attack on Malone or Desmet themselves.   Nowhere in this quote do the Breggins allege that Malone and his compatriots are the "global predators," nor does it attempt to align Malone as such; the quote merely (and quite clearly) states that in their opinion, the Malone/Desmet concepts are being used by unnamed "global predators" to achieve their agenda.[9]

Item 11 is a wildly out of context quote, that when considered in its entirety, is not defamatory.  Specifically, Malone alleges that the Breggins stated that "*Dr. Malone was 'in the middle of' the 'suppression of hydroxychloroquine.' Dr. Malone is engaged in deliberate 'fraud' to 'blind us to the predators.  He is a protector of the predators.'*"  The entirety of the first sentence of the Breggins actually reads: "He's also a part of another [government] group called "treating covid-19 with currently available drugs" <u>so he would have been</u> in the middle of the suppression of hydroxychloroquine. And I have found, well, I haven't "found," it's on his resume, are 2 studies and a project in which he's studying hydroxychloroquine in hospitalized patients."  Here, the thrust of the article is once again, an opinion of the Breggins regarding a public figure's expressed "opinion" in deciding not to utilize hydroxychloroquine in the treatment of the novel Coronavirus.  Moreover, the entire quote clearly states that it is the Breggins' opinion that the "suppression of hydroxychloroquine" was the "big fraud used

---

[9] A sustained debate over the COVID-19 policies and treatments utilized during the pandemic has ensued ever since, and is a part of the national and worldwide reflection upon the public policy and political decisions that were made during the COVID-19 outbreak that affected millions of people.

early on" by the government in the treatment of the virus, and did not say that "Dr. Malone is engaged in deliberate fraud to blind us to the predators," as Malone alleges in his Complaint. Again, the last part of the quote alleged by Malone and attributed to the Breggins disagrees with Malone's use of the two studies/projects in which he was engaged in "studying hydroxychloroquine in hospital patients" and opines that as a result, *"[w]hat Malone is doing to distract people, this is it, to blind us to the predators, he's a protector of the predators…"* (Emphasis added).  Clearly this is an opinion, and is not defamatory at all.

Item 12 is just like many of the earlier quotes attributed to the Breggins about Dr. Malone – a statement of opinion on a matter of important public concern.  Malone alleges that the following statement made by Dr. Breggin is defamatory: "*Dr. Malone has 'really got a conspiracy going with Mathias Desmet.' Mass formation psychosis has 'no scientific basis at all… Zero.' Dr. Malone's goal is 'blinding us to who is really the problem – the problem is empire builders.' Dr. Malone's goal is to protect the "elite.' 'the people in power.' 'It's a very serious accusation.'"*  This is again, a quote not in its entirety, and taken out of context. When considering the entire quote of the Defendant, it is without a doubt that Dr. Breggins engaging in an academic, scientific, psychological and political debate over public policy, with Breggins expressing an opinion that is contrary to the publicly expressed opinion of Dr. Malone:

> "What he's [Desmet] doing, and Malone is following every bit of this, is that the concept of mass psychosis it's the same as the mass hypnosis and the mass formation, it blames the people, it blames the victims, it says there is a big portion of the population that drives and originates totalitarianism and literally not the leaders but these flawed people who are so frightened and anxious and disorganized and confused, that they create or invite the totalitarian leader. Now, again, another problem with this is that this makes this into a mass, it is collectivist thinking. um and it is aiming at blinding us to who is really the problem, the problem is empire builders, and it's always been empire builders making large organizations that control and oppress people, it goes back to India, ancient India and ancient China which were called totalitarian states, totalitarian empires historically…" (Breggin interview,

https://rumble.com/v1iiqxz-doctor-peter-breggin-dr.-breggin-asks-why-isdoctor-malone-a-partner-in-nih.html, 4:53 – 6:06).

Item 13 does not fare any better in the defamation analysis either when the entire quote is considered.  Malone alleges that Breggins stated: *Dr. Malone is part of the "Deep State" oppressors. Dr. Malone's concept of mass formation psychosis is calculated to protect the "mass murderers of COVID-19." Dr. Malone is a Hitler apologist and "excuser": "Malone wake up to history."* When examining the entire interview of Dr. Breggin on this show, nowhere in the show can it be found that Dr. Breggin made the statement that Malone attributes to him that he is a part of the "Deep State oppressors."  Malone's allegations that Breggin stated that "Dr. Malone's concept of mass formation psychosis is calculated to protect the 'mass murderers of COVID-19' is actually Breggin talking about Dr. Desmet, and <u>not</u> Dr. Malone.  And lastly, nowhere in this recorded interview (or anywhere else for that matter) can it be found where Dr. Breggin ever stated that Dr. Malone is "a Hitler apologist and excuser."  Moreover, the only quote that can be found to be semi-accurate, "Desmet, Malone, wake up to history." is a pejorative at best, and an admonition even, but it is <u>not</u> defamatory.

Finally, Item 14 in the Malone "Statement of Material Facts" found within his Complaint, Malone alleges that Breggin stated: *"Dr. Malone is responsible for the 'COVID Pandemic' and has intentionally committed crimes against humanity. Dr. Malone is 'weaponizing psychiatry' against the American public."* This allegation of defamation has two parts, and therefore must be analyzed as such.  First, the statements "Dr. Malone is responsible for the COVID pandemic" and/or that Malone has "intentionally committed crimes against humanity" have never been uttered by Dr. or Mrs. Breggin about Malone or anyone else, and cannot be found anywhere in the presentation cited by Malone in his

Complaint.[10]  Second, in the presentation, Dr. Breggin gave a long and complete answer of

why, in his opinion, the use of the concept of "mass pyschosis" being potentially used against

the public was dangerous.  In expressing his opinion, Breggin was engaged in a healthy

debate about matters of public concern, and therefore his positions on these issues cannot be

considered defamatory.

### III.      The Plaintiff Fails to State a Cause of Action Against Either Dr. or Mrs. Breggin For Defamation

### A.      Most of the Allegedly Defamatory Statements Are Plainly Opinion

1.      *Statements Amounting to Opinion or Hyperbole Are Not Actionable*

Statements of pure opinion are not actionable.  As the Supreme Court of Virginia

explained in *Chaves v. Johnson,* 230 Va. 112 (1985):

> Pure expressions of opinion, not amounting to "fighting words," cannot form
> the basis of an action for defamation.  The *First Amendment to the Federal
> Constitution* and *article I, section 12 of the Constitution of Virginia* protect
> the right of the people to teach, preach, write, or speak any such opinion,
> however ill-founded, without inhibition by actions for libel and slander.
> "[E]rror of opinion may be tolerated where reason is left free to combat
> it." Thomas Jefferson's First Inaugural Address (1801). "However
> pernicious an opinion may seem, we depend for its correction not on the
> conscience of judges and juries but on the competition of other ideas."
> *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974).

*Id*. at 119; *see also Schaecher v. Bouffault,* 290 Va. 83, 102-03 (2015).

In order to support a claim for defamation, a statement must be capable of

being proved true or false.  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4thCir.

1993)) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).  "Thus, speech

---

[10] The title of the show, *"Psychiatric Doctor BLASTS MRNA Inventor: 'Mass Formation Psychosis' Blaming YOU for the Plandemic"* was not written by Breggin, but despite that fact, the title does not state that Malone was being blamed for the pandemic, but rather clearly states that the concept of "mass formation psychosis" is blaming you ("the people") for the cause of the pandemic. This is clearly a mistake of interpretation on Malone's part, not an intent to defame on the Breggins' part.

14

which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action." *Schaecher*, 290 Va. at 102 (quoting *Yeagle v. Collegiate Times,* 255 Va. 293, 295 (1998)); *Jordan,* 269 Va. at 576.  In applying this standard, the Supreme Court of Virginia has expressly held that statements "that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Id.; see also Chaves,* 230 Va. at 118-19 (dismissing a defamation claim based on a statement that was "in its nature relative, depending for its import largely upon the speaker's viewpoint").

Similarly, hyperbolic statements are not actionable, particularly when they relate to public officials or matters of public concern.  The Supreme Court of the United States emphasized the importance of robust public debate on matters of public concern in *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6 (1970), where a local newspaper had published articles characterizing a real estate developer's negotiating position as "blackmail." The Court held that a reader would recognize the word "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.* at 14.  In reaching this conclusion, the Court emphasized the importance of having open discussion on matters relating to government and the individuals who run it:

> "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means ... is a fundamental principle of our constitutional system." *Stromberg v. California,* supra, 283 U.S. at 369, 51 S.Ct. at 536. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed.1093.  Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the

permissible scope of such liability."

*Id.* at 11-12; *see also Milkovich,* 497 U.S. at 20 (explaining the *Greenbelt* decision as necessary because it "provides assurance that public debate will not suffer for lack of imaginative expression ...  which has traditionally added much to the discourse of our Nation.").  Virginia law and courts throughout the country routinely dismiss defamation actions based on statements about criticisms about how a person has performed in their profession. See, e.g., *Gibson v. Boy Scouts of Am.*, 163 F. App'x 206 (4th Cir. 2006) (calling a person "unfit," without any "discernible criteria" by which to measure fitness, was not actionable); *Ghawanmch v. Islamic Saudi Acad.*, 857 F. Supp. 2d 22, 44 (D.D.C. 2012) (in a case applying Virginia law, finding that statements that plaintiff "was not a good teacher," and that "she did not like teaching" were opinion); *Cummings v. Addison*, 84 Va. Cir. 334 (Norfolk 2012) (finding that an e-mail to the plaintiffs employer (a country club) that his family "did not join the club for [the plaintiff] employee to become a predator, stalk, and harass them or for an environment that would encourage this kind of behavior" was non-actionable opinion).

Here, we have two public figures in a debate over unresolved current scientific issues. The great debates over the origins of the COVID pandemic, the national "shut down," various treatment proposals, public policy decisions made by politicians, and the positions taken by scientists regarding the efficacy of the COVID-19 vaccine continue to this very day.  Everyone it seems, has an opinion.  And those opinions, as rational or as far-fetched as they may seem to be, are nevertheless expressions of free speech that must be protected. Both Plaintiff and the Defendants have actively participated in this debate forum, and they

16

clearly have different views; but the differences in each's position does not give rise to an action for defamation just because they disagree, and the expression of these opinions of matters of public concern, expressed in the public square by public figures, in whatever form expressed or the words used, do not rise to the level of common law libel or defamation in Virginia.

In performing its gatekeeping function, a trial court must examine allegedly defamatory statements "in context" in order to "determine whether a statement can be reasonably understood as stating or implying actual facts, whether those statements are verifiable, and whether they are reasonably capable of defamatory meaning...." *Schaecher v. Bouffault*, 290 Va. 83, 93 (2015). Moreover, a plaintiff cannot rely on a strained interpretation to create defamatory implications that do not flow naturally from the plain meaning of the words:

> [T]he meaning of the alleged defamatory language cannot, by innuendo, be extended beyond its ordinary and common acceptation. The province of the innuendo is to show how the words used are defamatory, and how they relate to the plaintiff, but it cannot introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain. *Webb*, 287 Va. at 89-90 (citation omitted); *Schaecher*, 290 Va. at 93.

Applying these principles, courts in Virginia regularly dismiss defamation claims where the published words do not convey the allegedly defamatory meaning urged by the plaintiff *See, e.g.. Webb,* 287 Va. 84 (holding that the trial court should have granted a demurrer where the article did not convey the implication asserted by the plaintiff); *Yeagle v. Collegiate Times*, 255 Va. 293, 297-98 (1998) ("[C]onsidering the phrase at issue in the context of the entire article... we find nothing which supports an inference that Yeagle performed her job with a lack of integrity or that she directed others to do so."); *Perk v. Vector Res. Grp.*, Ltd., 253 Va. 310, 316 (1997) (affirming a demurrer to a defamation action brought by a collections lawyer who claimed that his former client impliedly accused him of improperly converting or handling

money by advising debtors that the plaintiff had not remitted certain payments made by those

debtors); *PBM Prods., LLC v. Mead Johnson Nutrition Co.,* 678 F. Supp. 2d 390,402 (E.D. Va.

2009) ("When viewed in the context of a Press Release ... the statement does not literally or

impliedly communicate what Mead Johnson alleges"), affd, 639 F.3d 111 (4th Cir.2011); *Mann*

*v. Heckler & Koch Def., Inc.,* 639 F. Supp. 2d 619, 635-36 (E.D. Va. 2009) (finding that a

statement about placing an employee on administrative leave pending an investigation could not

be read to imply he was under investigation for defrauding the government without improperly

"pil[ing] one inference upon the other"), *affd*, 630 F.3d 338 (4th Cir. 2010); *Andrews v. Va.*

*Union Univ.*, Civ. Act. No. 3:07cv447, 2008 WL 2096964, at *13 (E.D. Va. May 15, 2008)

(finding no defamatory implication of unethical conduct arising from an email to the plaintiff in

which her boss included a copy of the code of ethics in reminding her of her duties).

### B.    Plaintiff Has Not Alleged Facts that Establish That Dr. or Mrs. Breggin Made any Statements with Actual Malice

In addition to failing to allege an actionable statement of fact, the Complaint also fails to

allege clear and convincing facts that Dr. Breggin and/or Mrs. Breggin acted with actual malice,

i.e., that they knew that any statement was false or actually had a high degree of awareness of

probable falsity.

### C.    The "Actual Malice" Standard

The United States Supreme Court first recognized the distinction between public and

private plaintiffs, and the differing standards of proof that apply to each, in the landmark

decision *New York Times v. Sullivan*, 376 U.S. 254 (1964). Explaining the need for open and

robust debate and discussion of public issues, the Court stated:

> "Those who won our independence believed ... that public discussion is a
> political duty; and that this should be a fundamental principle of the American
> government. They recognized the risks to which all human institutions are subject. But
> they knew that order cannot be secured merely through fear of punishment for its

18

infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed." at 270.

Thus, we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. *Id.* at 270.  Although sometimes mistakenly confused with common law malice, actual malice "has nothing to do with bad motive or ill will." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491U.S. 657, 666 n.7 (1989); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("Even if Cooper harbored ill will towards Reuber, and there is no evidence of that, the Supreme Court consistently has held that 'the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term.'"); *Jackson v. Hartig*, 274 Va. 2 I 9, 23 I (2007). Recklessness in a defamation case does not include gross negligence or other objective measures of conduct. Proof of negligence (e.g., failure to exercise care), spite/ill-will, or recklessness in the ordinary sense of gross negligence does not establish constitutional actual malice as a matter of law. A person can make a statement without any investigation and nevertheless believe that what he or she is saying is true. Constitutional malice is a purely subjective measure of what the defendant actually thought. See *Reuber,* 925 F.2d at 714. In simple terms, establishing actual malice requires clear and convincing proof that the defendant was "deliberately lying" or was engaged in conduct approaching "the level of publishing a knowing, calculated falsehood." *Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980).

The United States Supreme Court explained this crucial distinction in reversing a defamation verdict in *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), where the defendant had relied on a single source, whose reputation was unknown, without verifying the information: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *Id.* at 731-32; see also *Geliz v. Robert Welch, Inc.,* 418 U.S. 323, 332 (1974) ("[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth."). In *Richmond Newspapers, Inc. v. Lipscomb*, 234 Va. 277 (1987), the Supreme Court of Virginia explained at length the subjective nature of actual malice in concluding as a matter of law that a reporter had not acted with actual malice despite allegations and proof that: (1) the reporter's sources harbored bias or ill-will toward the plaintiff; (2) the reporter predetermined the facts of the story; (3) the reporter omitted information favorable to the plaintiff; (4) the reporter had no deadline pressure; (5) the newspaper editors sought confirmation of the facts of the story; and (6) the reporter told the plaintiff and the school board that he was going to publish the article whether they provided their comments or not (which the plaintiff took as a threat). *Id.* at 289-95. Differentiating common law malice from constitutional actual malice, the court held that "proof of ill will or bias on the part of an informant is not sufficient in itself to impute knowledge of probable falsity of the information." *Id.* at 290. The court further held that "even with the bias shown, no one of the six elements charged is legally sufficient to justify a jury's finding of a reckless disregard for the truth" and further held that "[w]e equally are convinced that a

consideration of all these elements as a group demonstrates the same inadequacy." *Id*. at 295.

### D.   The Plaintiff's Complaint Does Not Allege Facts Which Establish Actual Malice

While Plaintiff alleges in his Complaint that these "statements" are "materially false and unjustifiable," (Compl. 12), or "defamation *per se*" (Compl. 17), the only assertion of actual malice is found in paragraph 20; yet, all potential "malice factors" included here are based upon supposition and innuendo, and not upon fact.[11]  Even the factors listed by Malone in this paragraph do not address the critical question of whether the Breggins acted with knowledge of falsity or with a high degree of awareness of probable falsity.  The Fourth Circuit has made clear, however, that conclusory allegations of actual malice, even those that include circumstantial evidence of ill-will, lack of investigation, and intent to harm, are not sufficient to state a claim for defamation:

> Applying the *Iqbal* standard to this case, we find that the Appellants have not stated a claim.  To begin with, Appellants' assertion that Appellees' statements "were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity" is entirely insufficient. This kind of conclusory allegation -   a mere recitation of the legal standard - is precisely the sort of allegations that *Twombly* and *Iqbal* rejected.  The Appellants go on to point to their allegations that the Appellees intended to harm Mayfield by publishing his drug test results and that Aegis failed to follow SAMHSA testing procedures.  ***But these allegations simply do not suggest that Appellees knew. That their statements were false or that they were reckless with respect to their veracity***.  The Appellants continue by highlighting their allegation that Appellees were informed by Mayfield that he took both Claritin and Adderall, which was legally prescribed. But Appellants admit in their recitation of the facts that before Appellees announced Mayfield's suspension, they contacted Mayfield to follow up on the issue, asking him what drugs he had taken as part of their investigation. ***Perhaps most importantly, we must not forget the context in which the allegedly slanderous statements are made:*** Mayfield was randomly selected to undergo drug testing pursuant to a valid NASCAR policy and two separate tests yielded a positive result for methamphetamine, a drug that drivers are

---

[11] Moreover, Malone only uses the cumulative identifier, "Defendants" when referring to acts of supposed "actual malice" (as he does throughout the Complaint), and he does not ascribe any one act to any one defendant in particular, which makes the claim of "actual malice" factually deficient on its own.

prohibited from taking. The statements France made at the press conference did no more than report what the positive drug tests indicated -that Mayfield took a recreational or performance-enhancing drug. We therefore affirm the district court's dismissal of the complaint.

*Mayfield v. NASCAR, Inc.,* 674 F.3d 369, 377-78 (4th Cir. 2012) (emphasis added). This conclusion is consistent with the law of Virginia, which similarly does not permit conclusory allegations of actual malice to withstand a motion to dismiss. *See Tomlin v. IBM*, 84 Va. Cir. 280,288 (Fairfax County 2012); *Koegler v. Green,* 78 Va. Cir. 478, 482-85 (Hanover County 2009); *Jarrett v. Goldman,* 67 Va. Cir. 361, 374-76 (Portsmouth 2005).

More importantly, the Plaintiff here has not, and cannot allege facts sufficient to show actual malice. It is simply not possible for the Breggins to have acted with knowledge of falsity when both are engaged in the public forum platforms debating a very serious societal and scientific issue such as the one that these parties are engaged.

IV.    **The Statements Do Not Support a Claim for Defamation By Implication**

Count II (mislabeled as "Count I") asserts a cause of action under Virginia's common law remedy for "defamation by implication." According to Section 563 of the Restatement (Second) of Torts, "the meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." If the requisite level of intent for defamation liability is mere negligence (the usual standard in cases not involving public figures or officials), it might make sense to hold the speaker liable for a reasonable defamatory inference even if that inference was not the intended meaning. Since the Virginia Supreme Court decided *Pendleton v. Newsome*, however, it has been clear that plaintiffs seeking to hold defendants liable based on a defamatory implication must

demonstrate not only a defamatory inference but that the defendant <u>intended</u> to communicate that inference.

 *Pendleton v. Newsome* was an implied-defamation case brought by a private-figure plaintiff, so no showing of malice (as is necessary in the instant case) was required. Still, the court held that the plaintiff "must allege and ultimately prove that the defendant intended his words to express a defamatory innuendo, that the words actually did so, and that the plaintiff was actually defamed thereby." (*See Pendleton v. Newsome*, 290 Va. 162, 174 (2015)). The court held that while the speaker must have intended to express defamatory innuendo, this fact need not be apparent from the words of the statement: "Nor have we held that the defendant's words must, by themselves, suggest that the author intends or endorses the allegedly defamatory inference. Such a holding would immunize one who intentionally defames another by a careful choice of words to ensure that they state no falsehoods if read out of context but convey a defamatory innuendo in the circumstances in which they were uttered." (*Id.*) Thus, to prevail in a defamation-by-implication case, a plaintiff must prove:

  1.  that the defendant made the statements alleged in the complaint,

  2.  that the statements, even if facially true, were designed and intended by the defendant to imply a defamatory meaning,

  3.  that in the light of the circumstances prevailing at the time they were made, the statements reasonably conveyed that defamatory implication to those who heard or read them, and

  4.  that the plaintiff suffered harm as a result.

(*Id.* at 175).

 Plaintiff alleges, in conclusory language, that the "strong gist and implication" of the

statements listed in paragraph 10 of the Complaint is a defamatory intent, even if they

"carefully chose their words" so as to "imply a defamatory connection between them.."

(Compl. ¶ 23-24), but none of the allegations contained in the Complaint allege facts that

address the *Pendleton* requirements. Again, conclusory words are insufficient to overcome a

Rule 12(b)(6) challenge, and based upon what is contained in the entire Complaint, the

Plaintiff has failed to allege a sufficient claim for Defamation by Implication.

### V.    The Statements Do Not Support a Claim for Insulting Words

Count III of the Complaint asserts a cause of action under the insulting words

statute, claiming that "Defendants' defamatory words are fighting words, which are

actionable under § 8.01-45 of the Virginia Code...." ( Compl. 27-30).  This claim also fails

as a matter of law.  The insulting words statute has been largely assimilated into the law of

defamation and requires, at a minimum, sufficient allegations to support a cause of action for

defamation.  *See Shupe v. Rose's Stores, Inc.* 213 Va. 374 (1972) (noting that "all actions for

libel and insulting words under the statute are to be treated as slander" and dismissing

defamation and insulting words claims where the plaintiff failed to prove an actionable case

of defamation).  The Plaintiff also fails to allege words that were spoken by the Breggins in a

context sufficient "to provoke violence or breach of the peace."  The insulting words statute

was originally enacted to avoid duels and is sometimes referenced as the "anti-dueling

statute." *Hutchins v. Cecil,* 44 Va. Cir. 380, 382 (Fairfax County 1998).  Importantly, while

the statute has been largely assimilated into the common law of defamation, Virginia courts

have not abandoned the requirement that the plaintiff show that the words used "were such as

to provoke violence or breach of the peace." *Allen & Rocks, Inc. v. Dowell,* 252 Va. 439, 443

(1996).  In fact, courts routinely dismiss claims under the insulting words statute absent

allegations that the insults were "used in a verbal attack directed at a particular individual in a

face-to-face confrontation that presents a clear and present danger of a violent physical reaction." *Hutchins,* 44 Va. Cir. at 385.  *See also Thompson v. Town of Front Royal,* Civ. A. No. 5:98CV00083, 2000 WL 329237, at *4 (W.D. Va. Mar. 16, 2000) ("Even read in the light most favorable to the plaintiff, from the allegations of the complaint, the words allegedly spoken by [the defendants] cannot be construed as having been directed at a particular individual in a face to face confrontation and as presenting a clear and present danger of a violent physical reaction."); *Mak Shun Ming Hotung v. Hotung,* 85 Va. Cir. 241 (Fairfax County 2012) ("This court is of the opinion that for Virginia Code§ 8.01-45 to be actionable the words must be conveyed face to face or in such manner as to incite an immediate breach of the peace").

Plaintiff's conclusory allegation that any of the Breggins' statements contained "fighting words" is wholly insufficient to support a claim under the insulting words statute. Conclusory allegations that words tend to violence and a breach of the peace are not sufficient to state a claim. *See Hutchins,* 44 Va. Cir. at 381 ("The mere statements that the insults were made in public and tended to violence and a breach of the peace by themselves do not sufficiently state a compensable claim under Va. Code§ 8.01-45.").  Not one single allegation of defamation contained within the Plaintiff's Complaint contain words that would incite an immediate breach of the peace, and therefore this claim must fail.

WHEREFORE, Dr. and Mrs. Breggin respectfully request that the Court grant its Motion to Dismiss pursuant to 12 (b)(6) of the Federal Rules of Civil Procedures, and grant them both such other and further relief as the Court deems just and proper.

Respectfully Submitted,

PETER R. BREGGIN, MD.
GINGER ROSS BREGGIN
By Counsel

25

By /s/ William M. Stanley
William M. Stanley, Esq. - VSB# 37209
THE STANLEY LAW GROUP, PLLC
13508 Booker T. Washington Hwy.
Moneta, Va. 24121
p. 540-721-6028
f.  540-721-6405
bstanley@vastanleylawgroup.com

# C E R T I F I C A T E

I hereby certify that on the 8th day of June, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272 Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
Counsel for the Plaintiff

By /s/ William M. Stanley