UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| DR. ROBERT W. MALONE,      )<br><br>            Plaintiff,      )<br>    v.                      )<br><br>PETER R. BREGGIN, MD,       )<br>GINGER ROSS BREGGIN, and    )<br>DR. JANE RUBY               )<br><br>            Defendants.      ) | Case No. 3:22-cv-63 |

**MEMORANDUM OF LAW IN SUPPORT
OF DR. JANE RUBY'S MOTIONS TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT [DE 37]**

Defendant, Dr. Jane Ruby ("Dr. Ruby"), submits this Memorandum in Support of her Motions to Dismiss Plaintiff, Dr. Robert Malone's Amended Complaint ("Am. Compl.") [DE 37] under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

**I.      PROCEDURAL POSTURE**

Plaintiff, Dr. Robert W. Malone ("Dr. Malone"), filed this suit against various defendants on October 30, 2022 [DE 1]. Dr. Ruby submitted her Motions to Dismiss and Memoranda of Law [DE 30, 31, 32, 33] after which Dr. Malone amended his complaint. [DE 37]. Dr. Malone's amendment did not cure any of the bases for dismissal. If anything, Dr. Malone's second bite at the apple clarifies that this matter is due to be dismissed against Dr. Ruby, with prejudice.

## II.      SUMMARY OF ARGUMENT

Dr. Malone is a self-professed crusader for vaccine safety with a history of using the courts against those with whom he disagrees.[1] Here, he sues Dr. Ruby, a Florida resident and online political and current affairs commentator. He seeks $25 million in damages against her and others for purported defamation and speech-related torts. His admitted goal, however, is to chill free speech. Referring to this case, Dr. Malone recently said:



> **Robert W Malone, MD** ✔
> @RWMaloneMD
>
> **If I can win these lawsuits (and that is a big "if"- defamation lawsuits are very hard to win), then this will hopefully have a chilling effect on the corporate media + internet/ social media defamation business model that so many pursue- because it is profitable.**
>
> 6:53 PM · 3/27/23 · 24.6K Views

*See* Declaration of Ronnie Bitman or "DRB," at ¶ 3, Exh. 1.[2]

---

[1] *See*, *e.g.*, *Malone v. Twitter, Inc.*, 2022 WL 14835110, at *1 (Cal. Super. 2022) (relating to his suspension from the Twitter platform); *Dr. Robert W. Malone v. WP Company LLC, d/b/a The Washington Post*, 2022 WL 19517977 (W.D. Va. 2022) (civil action alleging defamation and related torts).

[2] This Court may take notice of a plaintiff's own admissions especially where he cannot dispute the accuracy of the information (meaning, the authenticity of the attachment is not disputed). *See Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("The rationale of the 'incorporation by reference' doctrine applies with equal force to internet pages as it does to printed material."); *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) ("We may consider documents attached to the complaint, *see* Fed. R. Civ. P. 10(c), as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic."). The post may also be reviewed as evidence of plaintiff's motive for filing a defamation suit under Virginia's anti-SLAPP analysis. *See* Section III(g), below.

This action should be dismissed for several reasons, the primary being lack of personal jurisdiction over Dr. Ruby. This Circuit's law imposes a personal jurisdiction test for Internet publications that requires more than a coincidence between the plaintiff's state of residence and receiving allegedly defamatory statements in that state. The Complaint does not show, and Dr. Malone cannot proffer facts demonstrating, that Dr. Ruby's online postings were directed to Virginia or a Virginia audience, or that they addressed Virginia-centric issues. Rather, her online statements pertain to public health issues and were aimed at a global audience. This mandates dismissal for lack of personal jurisdiction over Dr. Ruby.

As a matter of substance, the Complaint states no claim against Dr. Ruby. <u>First</u>, Dr. Malone portends that the defendants collectively made all statements against him and that they should be collectively accountable. Well-established defamation law requires a court to attribute specific statements to specific defendants. Dr. Ruby will address and demonstrate there is no basis for liability as to each statement she is accused of making. <u>Second</u>, Dr. Ruby's purported statements are immunized by the Communications Decency Act of 1996. 47 U.S.C. § 230. She is a user of an interactive computer service (Telegram) who reposted or summarized others' statements; the reposting of quotations, citation and commentary of *others'* content is immunized from liability. <u>Third</u>, none of the statements meets the threshold for defamation, defamation by implication, or insulting words under Virginia law. Any statements were opinions based on matters of public import, using rhetorical hyperbole, and protected speech incapable of demonstrable truth or falsity. <u>Fourth</u>, as a limited purpose public figure, Dr. Malone has failed to allege actual malice, a constitutional requirement. <u>Finally</u>, because the statements are quintessential examples of emphatic, opinion-based speech that informs debate on matters of public concern, they are immunized by Virginia's anti-SLAPP protections. Va. Code Ann. § 8.01-223.2(A).

### III.   STATEMENT OF FACTS

Dr. Malone "is a world-renowned scientist and expert in the field of mRNA technology." [DE No. 37] at ¶ 1. He is "the original inventor of mRNA vaccination as a technology, DNA vaccination, and multiple non-viral DNA and RNA/mRNA platform delivery technologies." *Id*. at ¶ 3. He touts his position and reputation as a mainstay in this publicly important field, asserting he "has approximately 100 scientific publications with over 12,000 citations of his work ..." and that "[h]e has been an invited speaker at over 50 conferences, has chaired numerous conferences, and has sat on or served as chairperson on Health and Human Services (HHS) and Department of Defense (DoD) committees." *Id*. "He currently sits as a non-voting member on the National Institute of Health Accelerating COVID-19 Therapeutic Interventions and Vaccines (NIH ACTIV) committee, which is tasked with managing clinical research for a variety of drug and antibody treatments for COVID-19." *Id*.

Dr. Ruby is a current affairs and political commentator residing in Florida. *See* Declaration of Jane Ruby or "DJR," at ¶¶ 2, 4.[3] She posts information on Internet platforms called Gab, Twitter, and Telegram—from Florida. *Id*. That information includes online citations to social media posts, quotations to commentary by others, and various political and personal opinions and discussions. Am. Compl. ¶¶ 5, 10. She hosts an Internet show called the "Dr. Jane Ruby Show." *Id*. at ¶ 5. On her show, she discusses pharmaceutical drugs, regulatory processes, drug approvals, and other health-related topics of nationwide and global concern. *Id*. at ¶ 10; *see also* DJR ¶ 4; DRB at ¶¶ 4, 5, Exh. 2, 3.

---

[3] The Court may consider the Dr. Ruby declaration in connection with her 12(b)(2) motion to dismiss. *McCullough v. Gannett, Co., Inc.*, 2023 WL 3075940, at *4 (E.D. Va. 2023); *See also*, fn. 2, *supra*.

While the Complaint references multiple statements made by various defendants, the only alleged defamatory statements provided by Dr. Malone and attributed to Dr. Ruby are ten statements noted in Paragraph 10 of the Amended Complaint, two statements in Paragraph 5, and three in Paragraph 6. But, in referencing Dr. Ruby's "publications," Dr. Malone omits key phraseology that clarify several "statements" are actually third-party content, not Dr. Ruby's original creations.[4] The verbatim statements are as follows:[5]

**STATEMENT 1**: Am. Compl. [DE 37] at ¶ 10, bullet 2 (https://t.me/DrJaneRuby/7164):



---

[4] This sleight of hand is not foreign to Dr. Malone's counsel. *Agnew v. United Leasing Corp.*, 680 F. App'x 149, 154 (4th Cir. 2017) ("the submissions made by [Steven Biss] appear to constitute intentional misrepresentation or attempted deception").

[5] Dr. Malone fails to *accurately* cite the full statements. The actual linked statements, and written transcripts from the Internet show, are provided for the Court herein. *Lokhova v. Halper,* 441 F. Supp, 3d 238, 252 (E.D. Va. 2020) aff'd 995 F. 3d 134 (4th Cir, 2021) ("Without converting a motion to dismiss into a motion for summary judgment, a court may consider the attachments to the complaint, documents incorporated in the complaint by reference, and documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic.").

**STATEMENT 2**: Am. Compl. [DE 37] at ¶ 10, bullet 3 (https://t.me/DrJaneRuby/7165):



This is a **direct quote** from co-defendant, Breggin's blog located at

https://breggin.com/article-detail/post_detail/Robert-Malone-Health-Freedom-Movement-or-

Deep-State-Denizen-America-Out-Loud-PULSE.[6]

**STATEMENT 3**: Am. Compl. [DE 37] at ¶ 10, bullet 4 (https://t.me/DrJaneRuby/7166):



---

[6] *See* fn. 2, 5, *supra*. *See also* DRB, ¶ 6, Exh. 4A and 4B.

**STATEMENT 4**: Am. Compl. [DE 37] at ¶ 10, bullet 5 (https://t.me/DrJaneRuby/7167).

The link directs to a site hosted by Defendants, Peter and Ginger Breggin at www.breggin.com,

more specifically https://breggin.com/Threats-from-the-Desmet-Malone-Mass-Formationsand-

Mass-Psychosis. *Id.*



**STATEMENT 5**: Am. Compl. [DE 37] at ¶ 10, bullet 8: The Complaint cites a link:

https://rumble.com/vlj48gd-dr.-jane-ruby-show-mass-formation-psychosis-9s-a-psyop-against-

the-people.html and states an allegation that "Dr. Malone is orchestrating a 'psyop against the

people'." *Id.* The quote is <u>not</u> attributed to any specific speaker. In fact. Dr. Ruby **did not state**,

as alleged. *Id.* Rather, the internet interview of Dr. Breggin is entitled, "Mass Formation

'Psychosis' is a Psyop Against the People." *Id.*; *see also* DRB at ¶ 5, Exh. 3, transcript.

**STATEMENT 6**: Am. Compl. [DE 37] at ¶ 5: Without reference to any specific words, Dr.

Malone alleges that Dr. Ruby made defamatory statements on an October 3, 2022 episode of her

show titled "Overcoming Psychopaths and Global Tyranny." *Id.* We are left to guess what Dr.

Malone complains of in an hour-long Internet show.[7]

**STATEMENT 7**: Am. Compl. [DE 37] at ¶ 5: Without reference to any specific words, Dr.

Malone alleges that Dr. Ruby made defamatory statements on the Stew Peters Network to

"broadcast false and defamatory statements about Dr. Malone into Virginia." *Id.* We are left to

guess what Dr. Malone complains of in these online shows.[8]

---

[7] For a written transcript of the Internet show, see DRB at ¶ 4, Exh. 2.
[8] For written transcripts of the Internet shows, see DRB at ¶ 8, Exhs. 6, 7.

**STATEMENT 8**: Am. Compl. [DE 37] at p. 9, ¶ 6: Without reference to any specific words, Dr. Malone attributes a link to Dr. Ruby's Twitter account, citing https://twitter.com/RealDrJaneRuby/status/1643820068273283073.[9]

**STATEMENT 9**: Am. Compl. [DE 37] at p. 9, ¶ 6: Without reference to any actionable words, Dr. Malone attributes a link to Dr. Ruby's Twitter account, citing https://twitter.com/RealDrJaneRuby/status/1665452458720604163.[10] The Tweet, quoting a third party (Diana West), states:



**STATEMENT 10**: Am. Compl. [DE 37] at p. 9, ¶ 6: Without reference to any specific words, Dr. Malone attributes a link to Dr. Ruby's Twitter account, citing https://twitter.com/RealDrJaneRuby/status/1667278320520626177.[11]

---

[9] For a written transcript of the actual publication, see DRB at ¶ 9, Exh. 8.
[10] For a written transcript of the actual publication, see DRB at ¶ 10, Exh. 9.
[11] For a written transcript of the actual publication, see DRB at ¶ 11, Exh. 10.

## IV.    ARGUMENT

This lawsuit is due to be dismissed for lack of personal jurisdiction over Dr. Ruby, for failure to state any claims, and because the statements at issue are immunized from suit under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, and Virginia's anti-SLAPP statute.

### a.  THIS COURT LACKS PERSONAL JURISDICTION OVER DR. RUBY; HER ONLINE PRESENCE IS NOT VIRGINIA SPECIFIC

This action should be dismissed against Dr. Ruby, a Florida resident, for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Her online accounts and Internet show are not intentionally directed at a Virginia audience. The topics she opines upon are not Virginia specific. She lacks a substantial connection to the forum state. *Edwards v. Schwartz*, 378 F. Supp. 3d 468 (W.D. Va. 2019) ("Posting defamatory statements on social media, without more, does not constitute purposeful availment."); *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002) ("A person's act of placing information on Internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which information is accessed."); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) ("a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received."); *Alexander v. Ave.*, 473 F. Supp. 3d 551, 558 (E.D. Va. 2020) ("The Fourth Circuit, however, has rejected the argument that nonresident news organizations open themselves up to suit in a state simply by publishing online articles about that state's residents.").

### i.  DR. MALONE BEARS THE BURDEN OF MEETING JURISDICTIONAL TEST

When a court considers "a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a *prima facie* showing in support of its assertion of jurisdiction." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F. 3d 553,

558 (4th Cir. 2014). A court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). However, conclusory allegations of personal jurisdiction are not enough. *Orion Capital, LLC v. Promier Products, Inc.*, 2021 WL 4943501, at *2 (W.D. Va. 2021) ("a court need not credit conclusory allegations in determining whether a plaintiff has met his burden of making a prima facie showing of personal jurisdiction."); *Sonoco Prod. Co. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 407 (D.S.C. 2012) ("Plaintiffs offer nothing more than a conclusory statement to show that [defendant] solicited business in South Carolina.").

Before exercising personal jurisdiction over a non-resident defendant, a court must find that two conditions are satisfied. First, the state's long-arm statute must authorize exercise of jurisdiction in the circumstances.[12] Second, exercising jurisdiction must comport with Fourteenth Amendment due process standards. *Ellicott Mach. Corp., Inc. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993). The Fourth Circuit has interpreted Virginia's long-arm statute as being coextensive with the Due Process Clause. *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990). "Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when assessing personal jurisdiction in Virginia." *Orion Capital, LLC*, 2021 WL 4943501 at *2. The question is whether a defendant

---

[12] The Virginia long-arm statute provides that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's … transacting any business in this Commonwealth …causing tortious injury by an act or omission in this Commonwealth … causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth <u>if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth</u>." Virginia § 8.01-328.1 (A)(1), (A)(3), and (A)(4) (emphasis added).

has sufficient "minimum contacts with [Virginia] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 66 S. Ct. 154,158,90 L. Ed. 95 (1945).

Dr. Malone does not allege general jurisdiction over Dr. Ruby. *See* Am. Compl. ¶ 8 (alleging only that "Defendants are subject to **specific personal jurisdiction** …")[13] (emphasis added). The only issue presented is whether specific jurisdiction is appropriate. To determine the existence of specific personal jurisdiction, courts examine: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020).

**PART ONE OF TEST**—purposeful availment—embodies *International Shoe's* minimum contacts requirement. *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.,* 682 F.3d 292 (4th Cir. 2012); *see Int'l Shoe Co.*, 326 U.S. at 320 (examining whether the defendant has "establish[ed] sufficient contacts or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which [the defendant] has incurred there"). In this context, courts look to whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Fed. Ins. Co. v. Lake Shore Inc.,* 886 F.2d 654, 658 (4th Cir. 1989).

---

[13] Dr. Ruby is a nonresident who does not do business in the state and has no physical presence there. DJR, ¶ 3. She has no continuous and systematic contacts with Virginia. Consequently, the Court may not exercise general jurisdiction over her. *ESAB Grp, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) ("the threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction.").

The Internet presents unique challenges to establishing personal jurisdiction over nonresident defendants. The "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Edwards*, 378 F. Supp. 3d at 490. "Relevant to this analysis are the *quality* and *nature* of the defendant's connections, not merely the number of contacts between the defendant and the forum state." *UMG Recordings, Inc.*, 963 F.3d at 352. Courts should consider such factors as whether the defendant maintains offices or agents in the forum state; whether the defendant owns property in the forum state; and whether the defendant deliberately engaged in significant or long-term business activities in the State. *Sneha Media & Entn't, LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018).

**PART TWO OF TEST** – determines whether the defendant's acts giving rise to the suit were *directed* at Virginia. *Orion Cap., LLC*, 2021 WL 4943501 at \*3. In the Internet/defamation context, the Fourth Circuit holds: "a [s]tate may, consistent with due process, exercise judicial power over a person outside of the [s]tate when that person (1) directs electronic activity into the [s]tate, (2) with the manifested intent of engaging in business or other interactions within the [s]tate, and (3) that activity creates, in a person within the [s]tate, a potential cause of action cognizable in the [s]tate's courts." *Edwards*, 378 F. Supp. 3d at 490 citing *ALS Scan*, 293 F.3d at 714. In *Young,* the Fourth Circuit explained the dispositive question is "whether the [defendant] manifested an intent to direct their [online] content .... to a Virginia audience." *Young*, 315 F.3d at 263. "Something more than posting and accessibility is needed[.]" *Id.* "Internet postings" must "manifest an intent to target and focus on Virginia readers." *Id.* "[O]therwise, a 'person placing information on the Internet would be subject to personal jurisdiction in every State,' and the

'traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted.'" *Id.*

  **PART THREE OF TEST** – assesses whether the exercise of personal jurisdiction is constitutionally sufficient. Courts review five factors: (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies." *Asahi Metal Indus. Co.*, 480 U.S. at 102, 113.

## ii.   THERE IS NO BASIS FOR JURISDICTION OVER DR. RUBY

  Dr. Ruby is a Florida resident since 2020. Am. Compl. ¶ 5; DJR, ¶ 2. She was unaware Dr. Malone resided in Virginia. DJR, ¶ 5. Her online posts and Internet show, while available in Virginia, are also available elsewhere. *Id.* at ¶¶ 4, 5. She has not manifested an intent to direct her political commentary, opinions, criticisms, or other issues of global public importance to a Virginia audience. *Id.* at ¶¶ 3-5. She has not visited Virginia since 2020 (pre-dating any statement at issue here), has no offices in Virginia, no bank accounts, property, assets, or other interests in Virginia. *Id.* at ¶ 3. She did not specifically reach into Virginia or otherwise solicit specific business in Virginia. *Id.* She has no business, interests, or specific commerce emanating from or directed specifically to Virginia. *Id.* She has no employee nor any agent in Virginia. *Id.*

  Dr. Ruby does not know how many subscribers, followers, or fans she has in Virginia and does not specifically target Virginians as consumers separate from any other audience. *Id* at ¶ 5*.* She is <u>not</u> paid by any subscribers and does not solicit paid Virginia subscribers. *Id.* There are no relevant or applicable contracts executed or to be performed in this jurisdiction. *Id*. at ¶ 3. Dr. Ruby

13

has made no in-person contacts with Virginia since 2020 (predating any relevant statement at issue in this suit). *Id*. She conducts no business in Virginia. *Id*. There is no other allegation of relevant conduct that occurred in Virginia, and she did not specifically communicate with Dr. Malone in Virginia. *Id*. at ¶ 5. She is a "medical professional and a pharmaceutical drug expert with over 20 years of experience in regulatory processes for drug approval with the FDA and EMA." Am. Compl. ¶ 5.

Dr. Ruby's social media accounts and Internet show are available online and therefore available worldwide; her show is viewed by persons in Africa, Australia, and Russia. *Id.*; *see also* DJR, ¶¶ 4, 5. According to Dr. Malone's allegations, Dr. Ruby's concerns include global predators. *See* Am. Compl. *generally* (referencing "global" or "globalist" fifteen times). The quality and nature of her electronic activity pertains to COVID-19 and vaccines—a global issue. She does not discuss Virginia-specific events. The topics of the health freedom movement, mass formation psychosis, and the welfare of the general public are not targeted and aimed at Virginia. Am. Compl. ¶ 10. Interviewing an editor of an electronic journal from Rome on the ideas of globalism and medical tyranny is not targeted or aimed at Virginia. DRB, ¶ 4, Exh. 2. Discussing what may have happened in a Wuhan lab is not Virginia focused. *Id*. Discussing thoughts on COVID-19, the concept of "mass formation psychosis," and totalitarianism is not Virginia specific. *Id*. at ¶¶ 4, 5.

Dr. Malone admits Dr. Ruby's audience expands beyond Virginia. Am. Compl. ¶ 5. He alleges she produces and broadcasts a show on a network containing over 436,000 subscribers "in Virginia <u>and elsewhere</u>." *Id*. (emphasis added). He references her "Internet show" and her *international* social media platforms (which include Telegram, Twitter, Gettr, Gab, TruthSocial and CloutHub accounts), noting that she has subscribers "from Virginia <u>and elsewhere</u>." *Id*. (emphasis added). These allegations belie the notion that Ruby's online statements are specifically

14

focused upon a Virginia audience. *See, e.g.*, *Alexander*, 473 F. Supp. 3d at 557 ("the relevant websites, articles, and tweets reveal that the defendants intended to target the entire advertising industry <u>nationwide</u>.") (emphasis added).

Dr. Malone must allege plausible facts demonstrating Dr. Ruby intended to specifically direct her content in Virginia rather than nationwide. He has not done that and cannot do that. Nothing suggests that Dr. Ruby took affirmative steps to direct her statements specifically into Virginia or had any intent to target or focus on Virginia readers or otherwise avail herself of the benefits and protections of Virginia's laws. Dr. Ruby's statements were not published from Virginia or routed through servers in Virginia, nor were they of special interest to Virginia readers. There are no supporting allegations, by affidavit or otherwise, indicative of incidental, let alone purposeful, targeting of a Virginia audience.[14]

At best, Dr. Malone claims that Dr. Ruby placed her commentary online and he was harmed when he read them in Virginia. That is not enough. *Consortium for Indep. Journalism, Inc. v. Glob. News*, 2021 WL 1531417, at *8 (E.D. Va. 2021) ("the fact that Plaintiff resides in Virginia and suffered injury here does not, without more, establish the 'minimum contacts' for this Court to

---

[14] In his footnote 1, Dr. Malone vaguely alleges that Dr. Ruby "represented to readers that Dr. Malone was "lying" or "he's really stupid." [DE 37] at p. 6, fn. 1. The allegation buried in a footnote is unworthy of discussion. *Edwards v. Schwartz*, 378 F. Supp. 3d 468 (W.D. Va. 2019) (statements alleging that professor portrayed Michigan residents as dumb and dirty were protected speech and did not constitute actionable defamation). Separately, in seeking to tie Dr. Ruby to Virginia jurisdiction, Dr. Malone alleges Dr. Ruby published the statements "in the Charlottesville edition of *YourNews*." *Id*. Dr. Malone's attempt to tie Dr. Ruby to Virginia fails upon scrutiny, however. "DJR," at ¶ 6. ("yourNEWS is a news content distribution platform with a monetization model for news reporters and audio and video content creators whereby the content creators submit the content through a form on the yourNEWS website. The content creator does not select the methods or location of distribution nor the locale in which the information will be published. The content submitted is distributed by the yourNEWS editor without input by the content creator. [Dr. Ruby] did not select, urge, opine, or otherwise intend to distribute any content on yourNews in or to Virginia.")

exercise personal jurisdiction where the article and broadcasts were created for a Canadian audience concerning matters of Canadian politics."); *Alexander*, 473 F. Supp. 3d at 558 ("while Alexander may have felt 'the effects of any [defamation] in Virginia, where he lives and works,' the relevant question remains 'whether the defendant has expressly aimed or directed its conduct toward the forum state.'").

Dr. Malone's claims fail all three parts of this Circuit's jurisdictional analysis. Dr. Ruby did not purposefully avail herself of Virginia and has no reason to anticipate being haled into Court here. *Fed. Ins. Co.,* 886 F.2d at 658. Her online content emanating from Florida was not intended to target Virginia, did not opine on Virginia-centric issues, and was accessible to anyone with an Internet connection. *Edwards*, 378 F. Supp. 3d at 490; *Young*, 315 F.3d at 262–63. The burden on Dr. Ruby to litigate in this foreign forum is great given her lack of dealings, business, or relation to this State. This forum has no interest in adjudicating this dispute merely because the Plaintiff resides in Virginia. *Consortium for Indep. Journalism,* 2021 WL 1531417, at *8; *Alexander*, 473 F. Supp. 3d at 558. When considering the "general thrust and content" of Dr. Ruby's Internet show and online posts, she has not "manifest[ed] an intent to target or focus on Virginia readers." *Young*, 315 F.3d at 263. There is no plausible fact alleged that Dr. Ruby purposefully used the Internet and social media platforms to direct her commentary at or into Virginia. Dr. Ruby has no connection to this forum, and it would be unconstitutional to require her to litigate here. *Calder v. Jones,* 465 U.S. 783 (1984).

While this forum is convenient for Dr. Malone, he can obtain the same relief in a Florida federal court. The most efficient resolution would be one where Dr. Ruby at least had minimum contacts and one in which she could foresee being subjected into that court's jurisdiction under that forum's laws. *Asahi Metal Indus. Co. v. Superior Ct. of California, solano Cnty.*, 480 U.S.

102, 113 (1987). Each element of this Circuit's jurisdictional test is resolved in Dr. Ruby's favor and mandates dismissal.

### iii.  DR. MALONE'S ALLEGATIONS OF A "CONSPIRACY" TO SUBJECT DR. RUBY TO JURISDICTION ARE CONCLUSORY AND FALL FAR SHORT

Dr. Malone attempts to allege a conspiracy between the defendants and others to establish jurisdiction over Dr. Ruby. Am. Compl. [DE 37] at ¶ 6 ("The Breggins and Ruby publish false and defamatory statements about Dr. Malone directly and **in concert with one or more persons** believed to reside in Virginia, including Paul Elias Alexander ("Alexander").") (emphasis added); *Id*. ("**Acting in concert** with the Breggins and Ruby between January 2023 and the present, with the joint goal in injuring Dr. Malone's reputation in the medical community, Alexander repeatedly published (almost daily) false and defamatory statements on his substack and Twitter about Dr. Malone …") (emphasis added); *Id*. ("Through June 29, 2023, Alexander **continued to work with the Breggins and Ruby** to publish the same false and defamatory statements about Dr. Malone on the Breggins' website, on Ruby's social media, and on Alexander's substack.") (emphasis added); *Id*. ("It was an **thoroughly orchestrated group grope** to defame Dr, Malone in Virginia and elsewhere, right down to the word.") (emphasis added); *Id*. at ¶ 10 ("part of a **concerted effort** to defame Dr. Malone …") (emphasis added).

"To proceed on a conspiracy theory of jurisdiction, a plaintiff must "make a plausible claim (1) that a conspiracy existed; (2) that the [ ]defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia." *Id*. Dr. Malone's allegation that the Breggins and Ruby along with non-party initiated a smear campaign against Dr. Malone does not suffice to confer jurisdiction. *Id.* at 559 ("[Plaintiff's] speculation that the defendants coordinated their

activities to injure him does not suffice to allege a plausible claim of the existence of a conspiracy.").

Setting aside that one cannot be liable for another's publication,[15] Dr. Malone's conclusory allegations fall short of establishing a "conspiracy theory of jurisdiction." His conclusory allegations do not establish any plausible facts or methods in which Dr. Ruby may be subjected to this foreign jurisdiction. To the extent Dr. Malone intends to invoke a "conspiracy theory of jurisdiction," as alleged in *Alexander v. Ave.*, 473 F. Supp. 3d 551, 558-59 (E.D. Va. 2020), his conclusory allegations fall short.

Instead, Dr. Malone merely lumps all defendants together, claiming, without sufficient factual basis, "Defendants have minimum contacts with Virginia …" Am. Compl. ¶ 8. He continues the non-specific, allegation against all defendants saying "Defendants targeted a Virginia medical professional and used the internet and social media to direct false and defamatory statements to a Virginia audience. Dr. Malone's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Virginia, where Dr. Malone suffered injury to his reputation." *Id*. The allegations in the Amended Complaint fall short of alleging a *plausible* conspiracy and fail to provide any specifics nor demonstrate sufficient contacts with Virginia to subject Dr. Ruby to this jurisdiction. *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 330 (4th Cir. 2013) ("the plaintiffs' allegations of conspiracy are conclusory and speculative and do not satisfy the requirements for establishing a conspiracy theory of personal jurisdiction.").

---

[15] Because the publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability. Restatement (Second) of Torts § 558(b) (1977).

In sum, Dr. Ruby has no connections to this forum and it would be unconstitutional to require her to litigate in Virginia. *Calder v. Jones,* 465 U.S. 783 (1984).

### b.  MALONE'S CLAIMS ARE INDEPENDENTLY BARRED BY SECTION 230 OF THE COMMUNICATIONS DECENCY ACT

Dr. Malone sues Dr. Ruby for statements made by *others* that she reposted, linked to, cited, or summarized online. In this context, Dr. Ruby is a protected actor under the Communications Decency Act ("CDA"). 47 U.S.C. § 230. "Section 230 of the CDA protects certain internet-based actors from certain kinds of lawsuits[,]" including individual users of an interactive computer service who merely repost others' statements. *Ginsberg v. Google Inc.*, 586 F. Supp. 3d 998, 1004 (N.D. Cal. 2022); *Banaian v. Bascom*, 281 A.3d 975, 980 (N.H. 2022) ("That individual users are immunized from claims of defamation for retweeting content that they did not create is evident from the statutory language.").

Under the CDA: (1) "[n]o provider or user" of (2) "an interactive computer service" is to be treated as the publisher or speaker of any information (3) "provided by another information content provider." 47 U.S.C. § 230(c)(1). Essentially, "providers and users of interactive computer services" are immunized from liability when the defamatory material is provided by someone else. *Directory Assistants, Inc. v. Supermedia*, LLC, 884 F. Supp. 2d 446, 453 (E.D. Va. 2012). "Section 230 of the CDA provides broad immunity to entities that facilitate the speech of others on the Internet." *Teatotaller, LLC v. Facebook, Inc.*, 242 A.3d 814 (N.H. 2020); *see Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (explaining that the intent of the CDA is "to promote rather than chill internet speech").[16]

---

[16] "There has been near-universal agreement that section 230 should not be construed grudgingly, but rather should be given broad construction." *Teatotaller, LLC*, 242 A.3d. at 449; *Banaian*, 281 A.3d at 980; *Directory Assistants, Inc.*, 884 F. Supp. at 452; *Campbell v. Reisch*, 367 F. Supp. 3d

Section 230 of the CDA abrogates the common law of defamation as applied to individual users. The CDA provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). The statute's plain language confers immunity from suit upon users and that "Congress chose to immunize all users who repost[ ] the content of others." *Banaian*, 281 A.3d at 980. That individual users are immunized from claims of defamation for retweeting content they did not create is evident from the statutory language. *See Zeran v. America Online, Inc.*, 129 F.3d 327, 334 (4th Cir. 1997) (explaining that the language of section 230 makes "plain that Congress' desire to promote unfettered speech on the Internet must supersede conflicting common law causes of action").

CDA immunity has been found where a user forwards a website link via email. In *Directory Assistants*, *Inc.*, 884 F.Supp.2d at 447, several defamatory posts about the plaintiff were placed on a consumer-review website. Forwarding links to the posts did not constitute content creation and therefore the defendant was immune under Section 230. *Id.* at 452. The courts also extend CDA protection to "Retweeters." *Banaian*, 281 A.3d at 977. An internet user 'Retweets' a Tweet when he or she elects to publish the original Tweet in full on his or her account. A Retweet shows the original Tweet in full, including attribution to the person who initially published the Tweet." *McNeil*, 2017 WL 2625069 at *3. "Distributing a link via Twitter is materially indistinguishable from forwarding a link via email in that both methods do not substantively alter the content of the posts." *Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1321 (M.D. Fla. 2015).

CDA immunity extends to Dr. Ruby. Her reposting, quoting, linking, or summarizing of another's statements on Telegram is the equivalent of a Retweet, or forwarding a website link via

---

987, 989 (W.D. Mo. 2019); *McNeil v. Biaggi Prods, LLC*, 2017 WL 2625069 at *3 (E.D. Va. 2017).

email. Dr. Ruby is a "user" of social media platforms and those services are "interactive computer service[s]." *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Facebook qualifies as an interactive computer service because it is a service that provides information to 'multiple users' by giving them 'computer access * * * to a computer server,' 47 U.S.C. § 230(f)(2), namely the servers that host its social networking website."). And as gleaned from Dr. Malone's allegations, Dr. Ruby's posts "pass[ed] along information provided by '*another'* content provider." *Tanisha Sys., Inc. v. Chandra*, 2015 WL 10550967, at *8 (N.D. Ga. Dec. 4, 2015) (quoting 47 U.S.C. § 230(c)(1)) (emphasis added). The immunity depends on the source of the information. Where a third party provides the information from which online posts are made, the defendant is immune. *Roca Labs, Inc.*, 140 F. Supp. 3d at 1320 ("Thus, because a third party provided the information from which the profile and teaser were derived, the defendant was immune notwithstanding the reposting of alleged defamatory material.").

Many statements Dr. Malone complains of are immune from liability under the CDA.

**STATEMENT 1** (Am. Compl. ¶ 10, bullet 2):



This statement, beginning with, "**From Breggin**" is a statement in which Dr. Ruby is citing, attributing, quoting, or otherwise summarizing a third-party content creator, co-defendant, Dr.

Breggin.[17] *Id.* (emphasis added). The statement is not one attributable to Dr. Ruby. It is a reference to third party "information" generated online. 47 U.S.C. § 230(c)(1) ("[n]o … user of "an interactive computer service" is to be treated as a publisher or speaker of any information … "provided by another information content provider."). The "information" posted was attributed to another content provider. The statement is immune from common law defamation claims. *See also Roca Labs, Inc.*, 140 F. Supp. 3d at 1322 (manipulation or modification of underlying third-party information into summary does not preclude Section 230 immunity). Permitting this claim to stand would elevate academic citation, opinions, criticisms, or commentary of third party works to defamation liability.

**STATEMENT 2** (Am. Compl. ¶ 10, bullet 3):



This statement, beginning with, "**From Dr. Breggin:**" is a statement in which Dr. Ruby is citing, attributing, and quoting directly from a third-party content creator, co-defendant, Dr.

---

[17] Dr. Malone's Complaint omits the critical attribution, "From Breggin." Am. Compl. at ¶ 10, bullet 2.

Breggin.[18] *Id*. (emphasis added). *See also* DRB, ¶ 6, Exh. 4A and 4B.[19] The statement is not one attributable to Dr. Ruby. It is a reference to third party "information" generated online. 47 U.S.C. § 230(c)(1); *Roca Labs, Inc.*, 140 F. Supp. 3d at 1322. The "information" posted was attributed to another content provider. The statement is immune from common law defamation claims. *Id*. Permitting this claim to stand would render any academic citation, opinions, criticisms, or commentary of third party works to defamation liability.

**STATEMENT 3** (Am. Compl. ¶ 10, bullet 4)**:**



This statement, beginning with, "**Breggin makes some key points:**" is a statement in which Dr. Ruby is citing, attributing, and quoting a third-party content creator, co-defendant, Dr. Breggin.[20] *Id*. (emphasis added). The statement is not one attributable to Dr. Ruby. Her addition of her opinion, "NOT," does not alter the fact the information was attributable and was cited as a

---

[18] Dr. Malone's Amended Complaint omits the critical attribution, "From Dr. Breggin:" *Id*. at bullet 3.

[19] The direct quote was taken from the following third-party site: https://breggin.com/article-detail/post_detail/Robert-Malone-Health-Freedom-Movement-or-Deep-State-Denizen-America-Out-Loud-PULSE

[20] Dr. Malone's original Complaint [DE 1] omitted this critical attribution, "Breggin makes some key points:" *Id*. at bullet 4. He has included it in his Amended Complaint. Am. Compl. at ¶ 10, bullet 4.

third-party source. It is a reference to third party "information" generated online. 47 U.S.C. § 230(c)(1); *Roca Labs, Inc.*, 140 F. Supp. 3d at 1322. The "information" posted was attributed to another content provider. The statement is immune from common law defamation claims. *Id*. Permitting this claim to stand would render any academic citation, opinions, criticisms, or commentary of third party works to defamation liability.

**STATEMENT 4** (Am. Compl. ¶ 10, bullet 5, referencing https://t.me/DrJaneRuby/7167):



This fourth "statement" is similarly immune from suit based on the CDA. In paragraph 10, bullet 5, Dr. Malone cites to Dr. Ruby's link (https://t.me/DrJaneRuby/7167). *Id.* The link redirects to a third-party website published by defendants, Peter and Ginger Breggin: https://breggin.com/Threats-from-the-Desmet-Malone-Mass-Formations-and-Mass-Psychosis. *Id.* This is not a statement from Dr. Ruby. It is *ipso facto* unaltered third-party content protected by the CDA's republication permissions. 47 U.S.C. § 230(c)(1).

**STATEMENT 5** (Am. Compl. ¶ 10, bullet 8):

The Complaint cites a link: https://rumble.com/vlj48gd-dr.-jane-ruby-show-mass-formation-psychosis-9s-a-psyop-against-the-people.html and alleges that "Dr. Malone is orchestrating a 'psyop against the people'." *Id*. The quote is <u>not</u> attributed to any specific speaker. In fact, Dr. Ruby **<u>did not state</u>**, as alleged. DRB at ¶ 5, Exh. 3. Rather, the internet interview of Dr. Breggin is *entitled*, "Mass Formation 'Psychosis' is a Psyop Against the People." *Id.* Dr. Malone presents no evidence or exhibit demonstrating that Dr. Ruby uttered the phrase that "Dr. Malone is orchestrating a 'psyop against the people.'" To the extent the information is derived

from a third-party content creator, Dr. Ruby is immune from repeating, reposting, quoting, citing, or discussing it. 47 U.S.C. § 230(c)(1).

STATEMENT 6 (Am. Compl. ¶ 5):

Dr. Malone alleges that Dr. Ruby made defamatory statements on an October 3, 2022 episode of her show titled "Overcoming Psychopaths and Global Tyranny." *Id*. He provides no specific words, phrase, or statement. We are left to guess what Dr. Malone complains of in an hour-long Internet show. The same immunity referenced above applies to any statements based upon third-party content creation.

STATEMENT 7 (Am. Compl. ¶ 5):

Dr. Malone alleges (without citing to the publication), that Dr. Ruby made defamatory statements on the Stew Peters Network to "broadcast false and defamatory statements about Dr. Malone into Virginia." He provides no specific words, phrase, or statements that he purports to be defamatory or otherwise actionable. We are left to guess what Dr. Malone complains of. The same immunity referenced above regarding the CDA applies to any statements based upon third-party content creation in this "publication."

STATEMENT 8 (Am. Compl. p. 9, ¶ 6):

Dr. Malone alleges (without citing to the publication), that Dr. Ruby defamed Dr. Malone in a linked tweet at https://twitter.com/RealDrJaneRuby/status/1643820068273283073. He provides no specific words, phrase, or statements that he purports to be defamatory or otherwise actionable. We are left to guess what Dr. Malone complains of. The same immunity referenced regarding the CDA applies to any statements based upon third-party content creation in this "publication" embedded in this tweet.

**STATEMENT    9**    (Am.    Compl.    p.    9,    ¶    6)    (cited    as
https://twitter.com/RealDrJaneRuby/status/1665452458720604163) :

Dr. Malone alleges that Dr. Ruby's Tweet below is actionable. He provides no specific
words, phrase, or statements that he purports to be defamatory or otherwise actionable. We are left
to guess what Dr. Malone complains of. He also ignores that this tweet is encompassed by
quotations and a citation to a third party, Diana West, and a link to Ms. West's quote.[21] This third
party content is immunized by the CDA.



**STATEMENT 10** (Am. Compl. ¶ 6):

Dr. Malone alleges (without citing to the publication), that Dr. Ruby defamed Dr. Malone
in a linked tweet at https://twitter.com/RealDrJaneRuby/status/1667278820520626177. He

---

[21]   The link to Ms. West's publication, which is included in Dr. Ruby's tweet is:
https://dianawest.net/Home/tabid/36/EntryId/4547/Dr-Robert-Malone-Sues-the-Breggins-Jane-Ruby-Platforms-for-25-Million.aspx. *See* DRB at Exh. 9.

provides no specific words, phrase, or statements that he purports to be defamatory or otherwise actionable. We are left to guess what Dr. Malone complains of. The same immunity referenced regarding the CDA applies to any statements based upon third-party content creation in this "publication" embedded in this tweet.

### c.   MALONE'S CLAIMS ARE BARRED BY SINGLE PUBLICATION RULE

Dr. Malone is afforded one cause of action for any single publication. *Davis v. Roessler*, 2022 WL 195496, at *6 (E.D. Va. 2022), *appeal dismissed* 2022 WL 3584866 (4th Cir. 2022). Subsequent distribution of a statement does not create an independent cause of action. *Id.* Hyperlinks and third-party retweets, without more, do not constitute republication and are not actionable pursuant to the single publication rule. *Crosswhite v. Reuters News & Media, Inc.*, 2021 WL 6125750, at *2 (W.D. Va. 2021). Here, Dr. Ruby merely posted hyperlinks to websites and articles from Breggin's site and otherwise quoted statements attributed to Breggin. She cannot be liable for defamation for the subsequent distribution of a statement made by others.

### d.   THE COMPLAINT FAILS TO STATE A DEFAMATION CLAIM UNDER VIRGINIA LAW

Dr. Malone fails to state a valid cause of action for defamation. In Virginia, the elements of a defamation claim are: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Virginia Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018). "To be actionable, the statement must be both [provably] false and defamatory." *Minnix v. Sinclair Television Group, Inc.* 2023 WL 3570955, at *4 (W.D. Va. 2023).

### i.   THE STATEMENTS IDENTIFIED IN THE COMPLAINT ARE NON-ACTIONABLE OPINION

For a statement to be actionable, it must be factual and provably false. *Tharpe v. Saunders*, 737 S.E.2d 890, 893 (Va. 2013). Virginia's highest court has stated that "speech which does not

27

contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person[,] cannot form the basis of a common law defamation action." *Yeagle v. Collegiate Times*, 497 S.E.2d at 137 (1998). The statements identified in the Complaint are non-actionable opinion. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

"[S]tatements of opinion are generally not actionable because such statements cannot be objectively characterized as true or false." *Jordan v. Kollman*, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). To that end, "opinions about a plaintiff's character or conduct cannot form the basis for a defamation claim," especially where the challenged "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint," *Fuste v. Riverside Healthcare Ass'n, Inc.,* 265 Va. 127, 132 (2003), or which a reasonable person "could only regard as a relative statement of opinion ground upon the speaker's obvious bias." *Chaves v. Johnson*, 230 Va. 112, 119 (1985); *see Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *10 (E.D. Va. 2012) (collecting cases) (holding that description of tax preparers as "unscrupulous" not defamatory); *see, e.g., Taylor v. CNA Corp.*, 782 F.Supp.2d 182, 201-03 (E.D. Va. 2010) (finding coworkers' statements that plaintiff was "intimidating" and "bullying" not capable of defamation); *Marroquin v. Exxon Mobil Corp.*, 2009 WL 1529455, at *9 (E.D. Va. 2009) (finding defendant's characterization of plaintiff's conduct as "very bad," "inappropriate," and "improper" were "an opinion of the scope and magnitude of [p]laintiff's wrongdoing that cannot be proven false").

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the Supreme Court described two subcategories of speech protected by the First Amendment. The first involves statements that are not "provable as false," meaning the language cannot be proved true or false by a "core of objective evidence" or by reference to an "objectively verifiable event." *Id*. at 21–22; *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998). Vague, judgment-based terms are not

actionable, including terms like "dangerous," or "'[r]ight-wing,' 'far-right,' and 'conspiracy theorist[.]'" *Cheng v. Neumann*, 51 F.4th 438, 446 (1st Cir. 2022).[22] The second category described in *Milkovich* involves statements that "cannot reasonably [be] interpreted as stating actual facts," meaning "loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining" an actual fact, or where the "general tenor" negates the impression that actual facts are being asserted. *Milkovich,* 497 U.S. at 20–21. This second safeguard includes protection for "rhetorical hyperbole" and "vigorous epithet." *Id*. at 17, 21.[23]

Overall, there exists a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks[.]" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). And, the reasonable reader or audience is expected to understand that a controversy "shades every statement made" in an emotional and heated public health debate. *Edwards*, 378 F. Supp. 3d at 510. The courts' function is to protect each citizen's First Amendment rights to "preserve an uninhibited marketplace of ideas in which truth"—whatever that truth may be—"will ultimately prevail ...." *Red Lion Broadcasting Co. v. F.C.C.*, 89 S. Ct. 1974 (1969).

---

[22] *See also Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1277 (M.D. Ala. 2019) ("Similar to the terms 'fascism,' 'radical right,' and 'political Marxist,' the term 'hate group' also suffers from a 'tremendous imprecision of the meaning and usage ... in the realm of political debate."); *Project Veritas v. Leland Stanford Junior Univ.*, 2022 WL 1555047, at *7 (W.D. Wash. 2022) ("disinformation" is subjective and not defamatory). This category also involves statements of subjective belief based on disclosed facts, as when "bases for the ... conclusion are fully disclosed, no reasonable reader would consider the [statement] [as] anything but the opinion of the author drawn from the circumstances related." *Chapin*, 993 F.2d at 1093; *see Biospherics*, 151 F.3d at 185 (collecting cases).

[23] *See also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 301–02 (4th Cir. 2008) (endorsing a district court holding that a statement remains protected if it is "clear to all reasonable listeners that [the statement is] offered ... as exaggerated rhetoric intended to spark the debate").

The statements at bar arise from a hot button issue in worldwide discourse. Dr. Malone and his critics were speaking about topics—the COVID-19 illness, vaccine, and pandemic—that at the time (and to this day) remain the subject of vigorous scientific debate. Because the lawsuit is aimed at protected opinion speech—speech that is important to the quest for truth—the Court should dismiss.

*McCullough v. Gannett, Co.* is directly analogous. *McCullough*, 2023 WL 3075940, at *9. Like Dr. Malone, Dr. McCullough is a medical doctor who purports to be a leader in the COVID-19 response. *Id.* at *1. McCullough, like Malone, sued his critics for their publications related to COVID-19. *Id.* at *1-2. One article, for example, included a statement from another doctor who described Dr. McCullough's speech as a politically motivated, ideological speech by a modern-day quack. *Id.* at *2. Here, like McCullough, the statements relate to the opinion that Dr. Malone should not be held up as the unofficial leader of the health freedom movement. However, as explained in McCullough, "[i]t is not this Court's job to pick sides in a scientific debate[,]" or to penalize and silence protected opinion speech. *Id.* at *7.[24]

*Immanuel v. Cable News Network, Inc.,* is likewise instructive. *Immanuel v. Cable News Network, Inc.,* 2022 WL 3030290, at *1 (S.D. Tex. 2022). There, the plaintiff-physician alleged

---

[24] *See, e.g., Arthur v. Offitt*, 2010 WL 883745, at *6 (E.D. Va. 2010) ("Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context."); *Resolute Forest Products, Inc. v. Greenpeace Int'l*, 302 F.Supp.3d 1005, 1021 (N.D. Cal. 2017) ("[t]he academy, and not the courthouse, is the appropriate place to resolve scientific disagreements;" dismissing defamation claims); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (granting motion for dismissal on the pleadings) ("Courts cannot inquire into the validity of scientific works, for any unnecessary intervention by the courts in the complex debate and interplay among the scientists that comprises modern science can only distort and confuse.") (citation omitted); *Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp. 719, 724 (S.D. Cal. 1995) (denying motion for preliminary injunction and holding that "[t]he Court cannot [inquire] into the validity of . . . scientific theories, nor should it") (dispute over scientist's claim that vitamin contained cancer-causing agent).

that CNN "accused her of 'spreading conspiracy theories on COVID-19' and promot[ing] an 'unproven drug' as an effective treatment option." The court rejected Dr. Immanuel's claim that she was defamed by CNN's statements that "she peddles disinformation, including harmful medical treatments, and therefore, endangers patients" (*id*. at *3), and granted CNN's motion to dismiss the complaint:

> Dr. Immanuel alleges that CNN defamed her by covering her statements advocating and promoting [hydroxychloroquine] to treat COVID and by criticizing her views as disinformation supporting harmful medical treatments. Statements of different, even conflicting, opinions, about unsettled matters of scientific or medical treatment that are the subject of ongoing public debate and deep public interest, cannot give rise to defamation claims. ***Courts do not use defamation law to decide or cut short arguments over unsettled questions of what medication best or most safely prevents or treats disease.***

*Id*. at *10 (emphasis supplied).

Finally, the court's analysis in *Arthur v. Offit* is apt. *Arthur v. Offit*, 2010 WL 883745 (E.D. Va. 2010). There, the plaintiff sued *Wired Magazine* over an article that portrayed her "as the anti-vaccine 'movement's brain' and describe[d] her organization as 'the largest, oldest, and most influential of the watchdog groups that oppose universal vaccination.'" *Id*. at *2. The plaintiff argued, as Dr. Malone does here, that *Wired* suggested her scientific conclusions were not credible. *Id*. at *6. The Court dismissed the lawsuit on a 12(b)(6) motion, holding that a statement accusing the plaintiff of lying about the effectiveness of vaccines "lacks the provably false content that is required to support a defamation action." *Id*. at *3, *6.

As the *Arthur* Court explained, the plaintiff's theory of liability would "ensnare the Court in the thorny and extremely contentious debate over the perceived risks of certain vaccines, their theoretical association with particular diseases or syndromes, and, at bottom, which side of this

debate has 'truth' on their side. That is hardly the sort of issue that would be subject to verification based upon a core of objective evidence." *Id*. at *6 (citation omitted). The Court concluded:

> Plaintiff may wish to defend in Court the credibility of her conclusions about the dangers of vaccines, the validity of the evidence she offers in support of those theories, and the policy choices that flow from those views — as well as her own credibility for having advanced those positions. These, however, are academic questions that are not the sort of thing that courts or juries resolve in the context of a defamation action. *Id*.

Consistent with the foregoing principles of law, the Court should dismiss this lawsuit for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Dr. Malone does not present issues that courts and juries can resolve. Nobody can declare whether Dr. Malone "is pushing this previously obscure and out of nowhere … psychoanalyst," (Am. Compl. ¶ 10, bullet 2), whether they are "criminaliz[ing] the general public," *Id*. at bullet 4, whether Dr. Malone was "part of any freedom or liberty movement prior to the covid scam," *Id*., whether he is "positioning himself as the 'leader of the health freedom movement,'" *Id*., or whether he is "orchestrating a psyop against the people." *Id*. at bullet 8. These are the types of opinion-based, politically charged, rhetorical statements used to emphasize points. They are categorically incapable of being declared true or false. Each statement is part of public debate surrounding COVID-19, public health, and vaccine safety. Matters left for robust discussion, debate, opinion and criticism—not for courts or juries to determine.

As further examples, Dr. Ruby interviewed Brother Alexis Bugnolo, a cultural anthropologist from Rome that has a particular interest in how societies deal with mass death and plagues. Am. Compl. ¶ 5. S*ee also* DRB, ¶ 4, Exh. 2. Brother Alexis spoke about his concerns over the shutdown of churches at the outset of the pandemic. *Id.* He later states that Dr. Malone let the cat out of the bag in saying that the Wuhan lab was working on a vaccine for bats but it escaped

from the lab and people caught it in town. *Id.* For Dr. Ruby's part, she asked Bugnolo for his thoughts on the concept of mass formation or mass formation psychosis. *Id*. Sparking discussion on the origin of COVID, the response, and the source of people's angst is far outside actionable defamation.

Likewise, in her interview of Dr. Breggin, Dr. Ruby and Breggin discuss "mass formation psychosis," a concept espoused by Dr. Malone and Mattias Desmet, wherein people have free-floating anxiety after society is decoupled from one another and they become hypnotized to a leader or series of events. DRB, ¶ 5, Exh. 3. "They literally become hypnotized and can be led anywhere."[25] The Breggin interview arises directly from issues related to the pandemic and public health concerns over what is best for society. These interviews give context to the statements against the idea of mass formation psychosis.

The "statements" complained of are the speaker's opinions that mass formation psychosis is not real and it is a concept that is harmful to the public. The words "fraudulent" and "criminalize" are not literal, but emphatic hyperbole used to emphasize the importance of the public health discussion. Each of the statements at issue constitute protected opinion-based speech that employ emphatic language that should be expected in public debate—and they are not provably false. Thus, they are not actionable.

---

[25] A written transcript of the Joe Rogan interview of Dr. Malone, discussing mass formation and Mattias Desmet, is available at: https://nehls.house.gov/media/press-releases/joe-rogan-experience-1757-dr-robert-malone-md-full-transcript. *See* DRB, ¶ 7, Exh. 5. The transcript is also subject to judicial notice. *Hall v. Virginia*, 385 F.3d 421, 424 (4th Cir. 2004).

### ii. MALONE, A LIMITED PURPOSE PUBLIC FIGURE, HAS NOT ALLEGED ACTUAL MALICE

This lawsuit also fails for the absence of the requisite intent. Dr. Malone is a limited public figure that participates, by his own admission, in one of the most globally important, and hotly contested events of our recent lifetime—COVID-19 and vaccine efficacy. Am. Compl. ¶ 3. He is subject to the heightened pleading standard of actual malice. His complaint is due to be dismissed because his allegations against Dr. Ruby are not indicative of actual malice. Malone fails to plead sufficient facts to show Dr. Ruby made statements *she* subjectively *knew* were false or that she made statements about Malone despite holding serious doubt as to the statements' veracity.

### 1. ACTUAL MALICE STANDARD

The requisite level of intent[26] associated with a defamation action varies depending upon the plaintiff's status as a "public figure," a "private figure," or a "limited-purpose public figure." *Spencer v. Am. Int'l Grp., Inc.*, 2009 WL 47111, at *4 (E.D. Va. 2009). In certain circumstances, constitutional law treats private citizens, who are not otherwise public figures, as public figures for the purpose of comment on a particular public controversy. *See, e.g.*, *Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Wolston v. Reader's Digest Assoc.*, 443 U.S. 157 (1979). "When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law." *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986).

---

[26] The Virginia Supreme Court has consistently used the term "intent" in its opinions to describe this element of the tort. Under defamation law, the precise purpose of the "actual malice" test is to impose the correct standard of *fault* on a plaintiff. It is a heightened standard, above mere negligence, that requires pleading and proof that the defendant had an awareness of the factual falsity of a statement when it was published.

Limited-purpose public figures are those who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). In voluntarily injecting themselves into a particular controversy, these individuals become public figures for a limited range of issues. *Id*. at 361. Whether a defamation plaintiff is a "limited-purpose public figure" is an issue of law. *See Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708 (4th Cir.) (en banc), *cert. denied*, 501 U.S. 1212 (1991).

Whether a plaintiff is a limited-purpose public figure depends upon "the nature and extent of [the] individual's participation in the particular controversy giving rise to the defamation." *Gertz*, 418 U.S. at 352. The Fourth Circuit has set forth five factors to guide lower courts in this inquiry, including whether: "(1) the plaintiff had access to channels of effective communication; (2) the plaintiff voluntarily assumed a role of special prominence in a public controversy; (3) the plaintiff sought to influence the resolution or outcome of the controversy; (4) the controversy existed prior to the publication of the defamatory statements; and (5) the plaintiff retained public figure status at the time of the alleged defamation." *See Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982), *cert. denied*, 460 U.S. 1024 (1983). Typically, the second and third *Fitzgerald* factors are combined into what is often considered the dispositive question at the core of the inquiry: "whether the plaintiff had voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome." *Id.*

The statements are only actionable if published with actual malice, which requires that the defendant either knew the statements were false or recklessly disregarded the truth. *Nunes v. WP Co. LLC*, 2021 WL 3550896, at *5 (D.D.C. 2021). A defendant acts in reckless disregard of the truth if it "in fact entertained serious doubts as to the truth of [its] publication" or acted "'with a

35

high degree of awareness of ... probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). The "'serious doubt' standard requires a showing of subjective doubts by the defendant." *Tavoulareas*, 817 F.2d at 789; *see also St. Amant*, 390 U.S. at 731 (explaining that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing" the statement); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt."). Subjective doubt can be proven through "the cumulation of circumstantial evidence, as well as through direct evidence." *Id*.

### 2. DR. MALONE IS A LIMITED PUBLIC FIGURE WHO MUST ADEQUATELY PLEAD ACTUAL MALICE TO SURVIVE DISMISSAL; HIS COMPLAINT FALLS SHORT

Dr. Malone is the paradigmatic example of a limited public figure who has exposed himself to public discussion through his activities. He has voluntarily, openly, and continuously assumed the self-proclaimed role as one of the world's leading experts on COVID-19. Am. Compl. ¶ 3. Through his purposeful and prominent work as a leader in the medical response to COVID-19, *Id.* at ¶¶ 1, 3, he has achieved significant influence over that public health controversy, and is thereby a public figure for the purposes of this lawsuit. *See Immanuel*, 2022 WL 18912180, at *14 ("Dr. Immanuel weighed in on controversial issues of public concern — how to medically treat COVID."); *McCullough*, 2023 WL 3075940, at *12 ("Dr. McCullough also acknowledges that he voluntarily assumed a role of special prominence" in the COVID-19 pandemic[.]").

Indeed, Dr. Malone falls squarely within the limited-purpose public figure test elaborated in *Fitzgerald* and discussed in *McCullough*, 2023 WL 3075940, at *12. Dr. Malone had access to channels of effective communication and has assumed a role of prominence in the COVID-19

discussion. Am. Compl. ¶¶ 1, 3. ("Dr. Malone has approximately 100 scientific publications with over 12,000 citations of his work (per Google Scholar with an 'outstanding' impact factor rating)."). He has been an invited speaker at over 50 conferences, has chaired numerous conferences, and has sat on or served as chairperson on Health and Human Services (HHS) and Department of Defense (DoD) committees. *Id*. at ¶¶ 1, 3. He sits as a non-voting member on the National Institute of Health Accelerating COVID-19 Therapeutic Interventions and Vaccines (NIH ACTIV) committee, which is tasked with managing clinical research for a variety of drug and antibody treatments for COVID-19." *Id*. And, like *McCullough*, "the fourth and fifth factors are clearly met." *McCullough*, 2023 WL 3075940, at *12. Controversy about COVID-19 treatments and vaccines began well before the publications. Given his current, prominent roles, Dr. Malone retained public figure status at the time of the alleged defamation.

"[I]t can hardly be debated that the allegedly defamatory statements giving rise to this matter relate to an existing public controversy — that is, 'a real dispute the outcome of which affects the general public or some segment of it in an appreciable way.'" *Waldbaum*, 627 F.2d at 1296; *see also OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 46-47 (D.D.C. 2005) ("To qualify as a public controversy, the law requires only that the issue be discussed publicly, and that the resolution of the issue affect others besides the immediate participants in the debate."). As every court to address the issue has held, the global public health crisis caused by the COVID-19 virus, and governmental efforts at both the state and federal level in responding to and combating the pandemic, are matters of paramount public concern.[27]

---

[27] *See, e.g., Scarborough v. Frederick Cnty.*, 517 F. Supp. 3d 569 (W.D. Va. 2021) (COVID-19 reporting is "speech on matters of public concern" that "falls squarely within the ambit of First Amendment protection"); *Barzilay v. City of New York*, 2022 WL 265719, at *16 (S.D.N.Y. 2022) (speech addressing response to COVID-19 pandemic is a matter of public concern that is of "great interest to the community," "value and concern to the public and of public importance");

As a limited purpose public figure, Dr. Malone must sufficiently plead facts that plausibly show Dr. Ruby either *knew* her statements were false or recklessly disregarded the truth. He fails to do so. Dr. Malone does not allege what studies, research, or other information Dr. Ruby had at her disposal which would impute knowledge that any of her own statements and publications were false when published. His vague allegation that Defendants fabricated statements is conclusory and not enough. Am. Compl. ¶ 20. His allegation that the Defendants (collectively) researched and reviewed Malone's website, substack, public appearances, etc. is vague and barren of detail to show what subjective knowledge they obtained upon review of Malone's materials – and how each of the specific publications at issue were knowingly false. *McCullough*, 2023 WL 3075940 at *14 (noting that vague allegation insufficient to show actual knowledge). The Amended Complaint does not show what factually provable information was gleaned by or available to Dr. Ruby. Dr. Malone alleged few to no facts about Dr. Ruby's knowledge regarding the falsity of each of her specific publications.

That Dr. Malone maintains a website, has made public appearances, observations, and comments about COVID-19, and purports to enjoy an elevated stature, does not *ipso facto* make the Dr. Ruby's statements inherently improbable. *Prince v. Intercept*, 2022 WL 5243417, at *17 (S.D.N.Y. 2022) ("the Court finds Plaintiff's general contention—that as a former Navy SEAL who earned the trust and confidences of multiple U.S. Presidents it is 'inherently improbable' that

---

*Washington League for Increased Transparency & Ethics v. Fox News*, 2021 WL 3910574, at *4 (Wash. Ct. App. 2021) ("[T]he pandemic, COVID-19, and government responses to this health threat represent legitimate news interests and are a matter of social and political concern to all Americans."); *Geller v. de Blasio*, 2020 WL 2520711, at *3 (S.D.N.Y. 2020), *app. withdrawn*, 2020 WL 4760303 (2d Cir. June 8, 2020) (classifying COVID-19 pandemic as a matter of public concern); *McLaughlin v. Sullivan Cnty. Bd. of Educ.*, 2021 WL 3744803, at *3 (E.D. Tenn. 2021) ("the COVID-19 pandemic . . . is unquestionably a matter of public concern").

he would offer military services to a sanctioned Russian entity—to be conclusory. [].”); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (“The standard for actual malice is not what a ‘reasonable person’ or a ‘prudent publisher’ would do, nor can it be defined as ‘an extreme departure from professional standards.’”); *Hanks*, 2012 WL 405065, at *12 (“in cases where a defamation claim requires a showing of actual malice, courts in the Eastern District of Virginia have found that conclusory allegations regarding the [defendants'] intent ... are insufficient to survive a motion to dismiss.”).

### e.   MALONE HAS NOT ADEQUATELY STATED A CLAIM BASED ON DEFAMATION BY IMPLICATION

To state a claim for defamation by implication, a plaintiff must allege: “(1) that the defendants made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendants to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that the plaintiff suffered harm as a result.” *Edwards*, 378 F. Supp. 3d at 504.

Dr. Malone’s allegations fall short of this standard. First, he fails to identify the exact statements made by Dr. Ruby. Regardless, she cannot be liable for merely reposting others’ statements, or providing a link to another’s blog. 47 U.S.C. § 230(c)(1). Dr. Malone fails to meet the first element of defamation by implication, *i.e.*, *that the defendant made the statements alleged*. Ruby is immune from all claims under the CDA and the single publication rule. And, as discussed later, she is immune under Virginia’s anti-SLAPP statute, Va. Code Ann. § 8.01-223.2(A).

Next, there is no defamatory implication apparent in the allegations. Even if Dr. Ruby questioned whether Malone is the *leader* of the health freedom movement in her posts, there is no defamatory implication in stating opinions or using rhetorical or exaggerated speech for purposes

of matters of great public political debate. *Florio v. Gallaudet Univ.*, 2022 WL 2785972, at *3 (D.D.C. 2022) (dismissing implication claim on of and concerning, opinion, and substantial truth grounds). A defamatory implication must be present in the plain and natural meaning of the words used. *Chapin*, 993 F.2d at 1092. Merely offensive or unpleasant statements are not defamatory. *Id.*

Here, the context of the alleged statements signal that the reader should expect emphatic language given the emotional and highly charged debate surrounding COVID-19. *Arthur*, 2010 WL 883745, at *5 ("the context of the remark—in a lengthy article describing an emotional and highly charged debate about an important public issue over which Defendant Offit and Plaintiff have diametrically opposed views—plainly signals to readers that they should expect emphatic language on both sides and should accordingly understand that the magazine is merely reporting Defendant Offit's personal opinion of Ms. Arthur's views."). There is nothing alleged that demonstrates Dr. Ruby intended anything other than having protected First Amendment discourse about matters of public debate. This claim is also due to be dismissed for all reasons articulated rendering the defamation count invalid.

### f. MALONE HAS NOT ADEQUATELY STATED A CLAIM FOR INSULTING WORDS

Dr. Malone also alleges that Dr. Ruby's statements were written and spoken in a way that tends to violence and humiliated, disgusted, and angered the Plaintiff. Am. Compl., ¶¶ 17, 18. Virginia Code § 8.01-45 provides that "all words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." His claim for insulting words fails for the same reasons as his defamation claim. The claims are co-extensive and rise and fall together. *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1284 (4th Cir. 1987). The Court should also dismiss because Dr. Malone does not allege any statements that tend to embrace violence or a breach of the peace. He fails to plead

facts that present a clear and present danger of a violent physical reaction. *Goulmamine*, 138 F. Supp. 3d at 669; *Jackson v. Middle Peninsula N. Neck Cmty. Servs. Bd.*, 2017 WL 216701, at *4 (E.D. Va. 2017); *c.f.*, *Carter v. Dominion Energy, Inc.*, 529 F. Supp. 3d 525, 547 (W.D. Va. 2021). The statements are also immune given the CDA's federal preemption and for all immunities, privileges, and defenses to the other defamation claims.

### g. MALONE'S CLAIMS ARE BARRED UNDER VIRGINIA'S ANTI-SLAPP LAW

Finally, Dr. Ruby is immune from these claims under Virginia's anti-SLAPP statute. Va. Code § 8.01-223.2(A) (2020). Virginia's anti-SLAPP statute provides immunity to those exercising their right to speak on matters of public concern in circumstances like those presented here:

> A. A person shall be immune from civil liability for . . . a claim of defamation based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party . . .. The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

*Id*. The statute reflects the General Assembly's strong support for free speech on matters of public concern. It also reflects the sound public policy that the courts should dismiss baseless lawsuits attacking freedom of expression—such as this one—swiftly.

"The purpose of Virginia's anti-SLAPP statute is to deter lawsuits that are designed to chill speech about matters of public concern. In effect, the anti-SLAPP statute provides another layer of protection for Virginia citizens' First Amendment rights: the statute weed[s] out and deter[s] lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech." *McCullough* , 2023 WL 3075940, at *15. "The chief concern motivating an anti-SLAPP statute is to protect defamation defendants from litigating 'meritless

civil action[s]' that are "intended to force upon a political opponent the high cost of defending against a lawsuit.'" *Id*.[28]

It is beyond question that the statements relate to a "matter of public concern." *Id.* at *8 ("it is undeniable that the COVID-19 pandemic is a matter of public concern."). Indeed, Malone sets the narrative when explaining, at the outset of his Complaint, that his mission is to ensure vaccine safety, limit harmful vaccine mandates, and teach about life-saving treatments for COVID-19. Am. Compl. ¶ 3. And the alleged publications arise from differing opinions on COVID, the health freedom movement,[29] vaccines, and the concept of mass formation psychosis promulgated by Dr. Malone and Matthias Desmet. For example, Dr. Malone cites, https://rumble.com/v1j48gd-dr.-jane-ruby-show-mass-formationpsychosis-is-a-psyop-against-the-people.html, an episode of Dr. Ruby Show with Dr. Peter Breggin. During the show, Dr. Ruby opines that Dr. Breggin is "a champion against the COVID scam" and foreshadows the discussion as whether mass formation psychosis is fact or fiction. DRB, ¶ 5, Exh. 3. Breggin then discusses his book, Desmet's book, and the concept of mass formation or mass formation psychosis. Breggin quotes the book as stating, "The only solution, once we understand what's going on, is to improve ourselves, not to attack any enemy. There are no enemies." *Id*. Dr. Ruby poses questions to Breggin like, "Wow. Wow. Why do you think someone like Dr. Malone would jump to defend and propagate this concept of mass formation psychosis?" *Id*. Later, Dr. Ruby asks Breggin whether Dr. Malone is part of a group called ACTIV (Accelerating COVID-19 Therapeutic Interventions in Vaccines.").

---

[28] Anti-SLAPP immunity should extend to parallel co-extensive torts. *Potomac Valve & Fitting*, 829 F.2d at 1284.

[29] Health freedom relates to the belief of individual choice in health treatments. Lewis A. Grossman, *The Origins of American Health Libertarianism*, 13 "Yale J. Health Policy, L. & Ethics" 76 (2013) ("There is a deep current of belief in the United States that people have a right to choose their preferred treatments without government interference.").

*Id*. It is plainly a discussion on matters of public concern. The discussions on the Dr. Ruby Show, and the Telegram posts, are part of the larger discussion on COVID-19 and the state of public health. *McCullough*, 2023 WL 3075940, at *16 ("Since the articles at issue were about the COVID-19 pandemic and the resulting medical responses to it, Plaintiff's defamation claim is 'based solely on statements ... regarding matters of public concern.' Va. Code Ann. 8.01-223.2A."). And again, Dr. Malone openly admits that the purpose of this lawsuit is to chill public speech.[30] DRB, ¶ 3 Exh. 1. On March 27, 2023, he tweeted:



Robert W Malone, MD ✓
@RWMaloneMD

If I can win these lawsuits (and that is a big "if"- defamation lawsuits are very hard to win), then this will hopefully have a chilling effect on the corporate media + internet/ social media defamation business model that so many pursue- because it is profitable.

6:53 PM · 3/27/23 · 24.6K Views

*Id*. Plainly, Dr. Malone seeks to silence Dr. Ruby by filing burdensome, costly, and meritless litigation over a foreign defendant, requiring her needlessly to expend significant resources to protect her freedom of speech.

Dr. Ruby's Telegram posts, twitter links, and her Internet show are protected by the First Amendment. She is immune from liability unless Dr. Malone has alleged facts that, if proven, would establish publication "with actual or constructive knowledge that they are false or with reckless disregard for whether they are false," Va. Code § 8.01-223.2(A) — that is, unless Plaintiff has adequately pleaded "actual malice." *Sullivan*, 376 U.S. at 280 (defining "actual malice" as publishing with "knowledge that [the publication] was false or with reckless disregard of whether

---

[30] *See* fn. 2, *supra*.

it was false or not"). As discussed in the preceding section IV(d)(2), he has failed to plead sufficient

facts to demonstrate that Dr. Ruby published the statements with actual malice. *AdvanFort Co. v.*

*The Mar. Exec., LLC*, 2015 U.S. Dist. LEXIS 99208, at *16 (E.D. Va. 2015) ("it is well established

that actual malice must be proved with respect to *each* defendant") (emphasis in original)).

Given that this is a quintessential SLAPP suit admittedly designed to chill free speech, an

award of attorney's fees is appropriate and necessary. The Court should exercise its discretion to

award prevailing party attorney's fees in Dr. Ruby's favor. This is especially so when considering

that Dr. Malone admits his improper motive – to chill free speech in this (hard to win) lawsuit. *C.f.*

*McCullough*, 2023 WL 3075940, at *16 (SLAPP fees denied where improper motive was lacking).

In assessing whether fees should be permitted, courts look at whether the action is "frivolous,

unreasonable, or without foundation" and whether "there is substantial basis in fact and in law for

the non-prevailing party to pursue the action." *Id*. "Courts also consider whether the plaintiff 'acted

out of an improper motive[,]' whether there is an 'imbalance in resources[,]' or whether an award

of fees would unfairly discourage other plaintiffs from bringing colorable claims. *Id*.

Fees should be awarded here. Dr. Malone filed this meritless action despite well-known,

controlling First Amendment precedent that protects opinion-based speech raised in a public health

debate and immunizes the re-posting of third-party content. He admits his goal is to chill free

speech on a matter of great public importance. His prominence, imbalance in resources as a well-

renowned academic and philosopher on the topics, his public and prominent position in the space,

and access to millions of followers, viewers, and government contacts demonstrate that he has the

resources to out-flank Dr. Ruby. Silencing critics through speech-related litigation for the stated

purpose of chilling opinion-based speech and the permissible republication of others' criticism is

the epitome of protected speech. This suit is meritless, and the motive is apparent. It is a paramount example of when anti-SLAPP fees should be awarded.

## V.    CONCLUSION

This Court should dismiss the Amended Complaint for lack of personal jurisdiction, and dismiss the action with prejudice as predicated upon non-actionable and protected speech. Dr. Ruby should be awarded her fees and costs in having to defend her First Amendment right to free speech.

**WHEREFORE**, the Defendant, Dr. Jane Ruby, respectfully requests that the Court grant this Motion and dismiss the Plaintiff's Amended Complaint for lack of personal jurisdiction, or alternatively because it fails to state a claim on which relief may be granted for the reasons listed above, and award attorneys' fees, costs, and any other relief deemed just and proper.

Dated:  July 20, 2023

Respectfully submitted,

MERRITTHILL, PLLC

/s/ *R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB No. 41539)
Craig Thomas Merritt (VSB No. 20281)
919 E. Main Street, Suite 1000
Richmond, VA 23219
Telephone:  804.916.1600
E-mail:  bhill@merrittfirm.com
E-mail:  cmerritt@merrittfirm.com

BITMAN O'BRIEN & MORAT, PLLC

/s/ Ronnie Bitman
Ronnie Bitman (admitted *pro hac vice*)
615 Crescent Executive Ct., Suite 212
Lake Mary, Florida 32746
Telephone: 407.815.3110
E-mail: rbitman@bitman-law.com

*Attorneys for Defendant Dr. Jane Ruby*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the non-registered participants.

Date:  July 20, 2023

/s/ *R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB No. 41539)
MERRITTHILL, PLLC
919 E. Main Street, Suite 1000
Richmond, VA 23219
Telephone:  804.916.1600
E-Mail:  bhill@merrittfirm.com

*Attorney for Defendant Dr. Jane Ruby*